309 S.E.2d 89

**STATE of West Virginia**

v.

**Betty Jean Dowd SIMMONS.**

**No. 15859.**

Supreme Court of Appeals of West Virginia.

Nov. 14, 1983.

Haranzo & McGuane and Michael W. McGuane, Riley & Broadwater and W. Craig Broadwater, Wheeling, for appellant.

Chauncey H. Browning, Atty. Gen., Silas B. Taylor and Ann Ewart, Asst. Attys. Gen., Charleston, for appellee.

MILLER, Justice:

Betty Jean Dowd Simmons appeals from her conviction by a jury in the Circuit Court of Ohio County of second-degree murder, for which she was sentenced to serve an indeterminate period of five to eighteen years. In her petition, the defendant argues that the trial court erred: in appointing the State's psychiatrist, Dr. David Smith, and in admitting his testimony into evidence; in refusing to grant her instruction relating to the effect of her mental condition upon the elements of the crime; in allowing a tape-recorded confession of the defendant to be played before the jury; in refusing to allow a witness to testify as to a remark made by the deceased; in restricting the scope of *voir dire;* and, in denying her motion for judgment of acquittal. After a thorough review of the record and a full consideration of the arguments presented, we conclude that the trial court did not commit reversible error and affirm the conviction.

At trial the defendant testified that in the early evening of April 10, 1981, she received a telephone call from her stepson Arthur Simmons, Jr., who was calling from a telephone booth outside of the Playmate bar in Wheeling, West Virginia. He related that he had just seen Jackie Rudolph (also known as Jacqueline Rae Rudolph West) take money out of his father's pockets.

The defendant also testified that prior to the homicide, her relationship with the victim, Ms. Rudolph, was strained because Ms. Rudolph claimed to be having an affair with the defendant's husband. The defendant stated that Ms. Rudolph constantly harassed her over the telephone about the alleged extramarital relationship and publicly swore at the defendant on a few occasions.

After receiving the telephone call, the defendant went upstairs to get dressed and in the process picked up a handgun that she and her husband kept in their bedroom. At trial, she testified that her memory of

the subsequent events was incomplete. She remembered walking to the Playmate bar, which was near her home. She stated that she saw Ms. Rudolph outside the bar, slapped her and then went home, but she could not remember shooting her.

After returning home, the defendant testified that she took five or six valium pills. During the course of the evening, prior to the shooting, the defendant testified that she had consumed an unspecified amount of alcohol, marijuana, and quaaludes while playing cards with friends. Three witnesses testified to seeing the defendant shoot and kill Ms. Rudolph, who died from a gunshot wound to her head.

## I.

### A.

The first assignment of error involves the court-ordered psychiatric examination of the defendant. This examination was made upon the request of the State and was conducted by a Dr. David Smith, who subsequently testified at trial. The defendant contends that the trial court erred in allowing Dr. Smith to testify for several reasons. First, the State's motion to have the defendant examined by Dr. Smith was untimely and prejudiced the defendant's trial preparation. Second, Dr. Smith violated the defendant's physician-patient privilege with Dr. David Hill, her treating psychiatrist, when he reviewed Dr. Hill's medical records. Third, Dr. Smith violated W.Va.

Code, 27–3–1, when he examined the defendant's medical records.

In order to better understand the defendant's arguments surrounding the court-ordered psychiatric examination, some additional facts are necessary. On October 8, 1981, the defendant's original attorneys filed a motion for discovery, pursuant to Rule 16 of the West Virginia Rules of Criminal Procedure [1] (hereinafter cited as W.V.R.Cr.P.). The discovery motion requested, among other things, a list of the witnesses and copies of all reports, scientific tests, and experiments that the State intended to use in its case. On November 24, 1981, the State substantially complied with the defendant's request. The State also filed with its answers a motion requesting disclosure of evidence from the defendant, pursuant to Rule 16(b)(1)(A), (B) and (C), including a request for a list of the defendant's witnesses, reports of any mental or physical examinations and copies of documents.

On June 3, 1982, new trial counsel were appointed to represent the defendant and they filed a motion on that same date giving the State notice, pursuant to Rule 12.-2(a) of the W.V.R.Cr.P.,[2] that they intended to present a defense based upon insanity. The trial court initially denied the defendant's motion, but at a subsequent hearing ruled that the defendant could present an insanity defense.

On July 26, 1982, two days before the trial was scheduled to begin, the State moved, pursuant to W.Va.Code, 27–6A–1(a),[3] and Rule 12.2(c) and

---

**1.** The West Virginia Rules of Criminal Procedure, which are almost identical to the Federal Rules of Criminal Procedure, were applicable to the present case, as the defendant was indicted on September 14, 1981. Rule 59 of the W.V.R. Cr.P. states:

"These rules shall take effect on October 1, 1981. They govern all proceedings in actions brought after they take effect and also further proceedings in actions then pending, except to the extent that in the opinion of the circuit court their application in a particular action pending when the rules take effect would not be feasible or would work injustice, in which event the former procedure applies."

**2.** Rule 12.2(a) of the W.V.R.Cr.P. states:

"*Defense of Insanity.*—If a defendant intends to rely upon the defense of insanity at

the time of the alleged crime, he shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the State in writing of such intention and file a copy of such notice with the clerk. If there is a failure to comply with the requirements of this subdivision, insanity may not be raised as a defense. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate."

**3.** W.Va.Code, 27–6A–1(a) (1977), which was revised in 1983, states, in part:

"Whenever a court of record believes that a defendant in a felony case or a defendant in a misdemeanor case in which an indictment

(d)[4] of the W.V.R.Cr.P., to have the defendant examined by a psychiatrist, Dr. David Smith. The State's motion for psychiatric examination was discussed at a pretrial hearing held before the trial court on July 26, 1982. The prosecuting attorney indicated that he had not received any written reports from the defense psychiatrist and that he had recently learned that the defendant had been hospitalized in May, 1981, for some mental condition.

The defendant objected to the State's motion on the ground that it was filed two days prior to trial, which would not allow the defendant enough time to properly prepare to meet the State's psychiatric testimony. The trial court granted the motion, ruling that the defendant had opened the door to the use of psychiatric evidence by raising the insanity defense and also holding that in the interest of fairness, the State needed the opportunity to have the defendant examined by its psychiatrist.

The defendant argues that the prosecution's late request for psychiatric examination should be determined to be prejudicial under Syllabus Point 2 of *State v. Grimm*, 165 W.Va. 547, 270 S.E.2d 173 (1980),[5] which dealt with nondisclosure of evidence which the State was ordered to produce as a result of the defendant's pretrial discovery motions. Here, the issue is a late request by the State for a psychiatric examination which to some extent differs from our cases involving nondisclosure or late disclosure of evidence previously ordered produced by the court. *E.g., State v. Schrader*, 172 W.Va. 1, 302 S.E.2d 70 (1982); *State v. Cunningham*, 170 W.Va. 119, 290 S.E.2d 256 (1981); *State v. Ward*, 168 W.Va. 385, 284 S.E.2d 881 (1981); *State v. Grimm, supra; Wilhelm v. Whyte*, 161 W.Va. 67, 239 S.E.2d 735

has been returned may be incompetent to stand trial or is not criminally responsible by reason of mental illness, mental retardation or addiction, it may at any stage of the proceedings after the return of an indictment or the issuance of a warrant against the defendant, order an examination of such defendant to be conducted by one or more psychiatrists, or a psychiatrist and a psychologist."

4. Rule 12.2(c) and (d) of the W.V.R.Cr.P. provides:

"(c) *Psychiatric Examination.*—In an appropriate case, the court may, upon motion of the attorney for the State, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the accused in the course of any examination provided for by this rule, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.

"(d) *Procedure for Psychiatric Examination.* —In any case where the court determines that a mental examination is required, the court shall proceed in conformity with Chapter 27, Article 6A, Section 1, of the West Virginia Code of 1931, as amended."

In *State v. Jackson*, 171 W.Va. 329, 298 S.E.2d 866 (1982), we outlined procedures to protect the fifth and sixth amendment rights of criminal defendants who are ordered by a court to undergo a psychiatric examination to determine competency to stand trial or sanity at the time of the crime. We rejected the implication made by the United States Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 465, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359, 370 (1981), and the holding of

several other courts, *e.g., United States v. Hinckley*, 525 F.Supp. 1342 (D.D.C.1981), *aff'd*, 672 F.2d 115 (D.C.1982); *White v. United States*, 451 A.2d 848 (D.C.1982), and *Blaisdell v. Commonwealth*, 372 Mass. 753, 364 N.E.2d 191 (1977), that a defendant who pleads insanity and presents psychiatric evidence to support his defense waives his fifth amendment right against self-incrimination. In Syllabus Point 3 of *Jackson*, we stated: "A defendant cannot waive his state and federal constitutional privileges against self-incrimination and rights to assistance of counsel at court-ordered pretrial psychiatric examinations except upon advice of counsel." We further reasoned:

"It is possible to compel a defendant to be examined by a psychiatrist to evaluate his insanity defense, without abrogating his Fifth Amendment privilege against self-incrimination. While some courts have required *Miranda* warnings, we feel safeguards other than *Miranda* protections can adequately protect a defendant and also provide the state an opportunity to get its own evidence about mental condition." *Jackson*, 171 W.Va. at 334, 298 S.E.2d at 871. (Footnote omitted)

5. Syllabus Point 2 of *State v. Grimm, supra*, states:

"When a trial court grants a pre-trial discovery motion requiring the prosecution to disclose evidence in its possession, non-disclosure by the prosecution is fatal to its case where such non-disclosure is prejudicial. The non-disclosure is prejudicial where the defense is surprised on a material issue and where the failure to make the disclosure hampers the preparation and presentation of the defendant's case."

(1977). The chief difference is that a State's request for a psychiatric examination is usually triggered by the use of an insanity defense by the defendant. Therefore, the element of surprise is considerably less since the defendant is already aware of the insanity issue. We believe that in this case, the *Grimm* test for prejudice can be used by analogy in determining whether the defendant was surprised on a material issue which hampered the preparation and presentation of her case.

The chief argument advanced by defense counsel is that the late examination was upsetting to the defendant and that defense counsel did not have an adequate opportunity to prepare for cross-examination or to secure another psychiatric witness to rebut Dr. Smith.

■ We note initially that defense counsel made no motion to continue the trial for a few days when the State's motion for psychiatric examination was made before the court. We believe that the failure to move for a continuance may have a material bearing on whether the psychiatric examination can now be asserted as reversible error. In *State v. Barker*, 169 W.Va. 620, 289 S.E.2d 207, 210 (1982), we concluded that where the defendant claimed surprise as to some evidentiary material, but failed to move "for a continuance ..., [he] ... waived his right to one." *See also People v. Scott*, 61 Mich.App. 91, 232 N.W.2d 315 (1975).

■ Furthermore, Dr. Smith's testimony contributed very little to the State's case in that he expressed no opinion as to the defendant's insanity. In one respect his testimony was helpful to the defendant because he testified that she had some mild atrophy of the frontal lobes of her brain. Although the defendant claims that the late examination was upsetting to her, she was able to testify at trial. Her counsel do not point to specific evidentiary lapses suppos-

edly brought about from the late examination.

The claim is also made that the defense was hampered by not being able to obtain a rebuttal psychiatrist. However, it must be remembered that it was the defendant who raised the insanity defense. She already had expert witnesses on this issue. It was the State which was attempting to secure a rebuttal witness.

Although we do not approve of the State filing a Rule 12.2(c) motion so close to the trial date, we conclude that there was no reversible error under the foregoing circumstances. We can envision situations where the filing of a Rule 12.2(c) motion within two days of the trial might prejudice the defendant unless a continuance is requested and granted. The better practice would be for the State to have the defendant examined by its psychiatrist at an earlier time in the pretrial process after it has been notified under Rule 12.2 that an insanity defense will be relied upon.

### B.

The second issue presented is that Dr. Smith violated the defendant's physician-patient privilege with Dr. Hill, her treating psychiatrist, when Dr. Smith reviewed some of Dr. Hill's medical records. Both Dr. Hill and Dr. Smith practiced together at the Wheeling Clinic and as a result Dr. Smith had direct access to the defendant's medical records.

■ No objection was made at trial on this ground, although Dr. Smith acknowledged on cross-examination that he had seen some of the defendant's medical records. These medical records had been introduced by the defendant prior to the direct examination of her psychiatric experts and were available to Dr. Smith when he testified in rebuttal. Thus, we find that the defendant was not actually prejudiced and this finding coupled with the lack of any objection made by the defendant at trial, forecloses any further consideration of this issue. *State v. Brewster*, 164 W.Va. 173, 261 S.E.2d 77, 79 (1979).[6]

---

**6.** For the defendant to have prevailed on this

point, provided a timely objection had been

### C.

The defendant's third argument is that Dr. Smith violated W.Va.Code, 27–3–1(a), when he obtained and read the defendant's medical records, which were on file in the chart room of the Wheeling Clinic, prior to his examination of the defendant.[7]

We have not had occasion to consider the meaning of W.Va.Code, 27–3–1(a),[8] as it relates to the confidentiality issue presented here. This section's location in Chapter 27 relating to mentally ill persons and the confidential information exceptions contained in W.Va.Code, 27–3–1(b),[9] which involve mental health proceedings, would suggest that the legislature intended this confidentiality with regard to communication and information to be maintained between mental health professionals and their clients.

■ We do not view the statute as creating any sort of a general psychotherapist-patient privilege. *See* Annot., 44 A.L.R.3d 24 (1972). Typically, a privilege statute identifies a specified relationship between two parties and is limited to information that is essential to the confidential relationship which forms the basis of the privilege. 8 J. Wigmore, *Evidence* § 2285, *et seq.* (McNaughton rev. 1972); 81 Am.Jur.2d *Witnesses* § 141, *et seq.* (1976). W.Va. Code, 27–3–1, does not define the relationship it is intended to protect, identifies only one party, i.e., the client or patient, and is written so broadly that the confidentiality is not limited to information essential to any confidential relationship.

■ It is difficult to determine the exact scope of the statute since the last sentence of subsection (a) seems to exclude confidentiality as to information "which does not identify a client or patient." We have not encountered a statute in another jurisdiction that is similarly worded.[10] We need

made, she would have been required to demonstrate that a general physician-patient privilege exists in this State. *See Mohr v. Mohr,* 119 W.Va. 253, 256, 193 S.E. 121, 122 (1937); F. Cleckley, Handbook on Evidence for West Virginia Lawyers 214 (1978); Note, *The Physician-Patient Privilege,* 58 W.Va.L.Rev. 76 (1955). It then would have been necessary to determine if the privilege extended to medical records obtained by a third party. Annot., 10 A.L.R. 4th 552 (1981).

7. The State correctly points out that the defendant did not specifically raise this issue at trial. However, the trial court permitted it to be raised in a post-trial motion. Because of the possible recurrence of the issue, we address it.

8. W.Va.Code, 27–3–1(a), states:

"Communications and information obtained in the course of treatment or evaluation of any client or patient shall be deemed to be 'confidential information' and shall include the fact that a person is or has been a client or patient, information transmitted by a patient or client or family thereof for purposes relating to diagnosis or treatment, information transmitted by persons participating in the accomplishment of the objectives of diagnosis or treatment, all diagnoses or opinions formed regarding a client's or patient's physical, mental or emotional condition; any advice, instructions or prescriptions issued in the course of diagnosis or treatment, and any record or characterization of the matters hereinbefore described. It does not include information which does not identify a client

or patient, information from which a person acquainted with a client or patient would not recognize such client or patient, and uncoded information from which there is no possible means to identify a client or patient."

9. The language of W.Va.Code, 27–3–1(b), is:

"Confidential information may be disclosed:
"(1) In a proceeding under section four [§ 27–5–4], article five of this chapter to disclose the results of an involuntary examination made pursuant to sections two, three [§§ 27–5–2, 27–5–3] or four, article five of this chapter;
"(2) In a proceeding under article six-A [§ 27–6A–1 et seq.] of this chapter to disclose the results of an involuntary examination made pursuant thereto;
"(3) Pursuant to an order of any court based upon a finding that said information is sufficiently relevant to a proceeding before the court to outweigh the importance of maintaining the confidentiality established by this section;
"(4) To protect against a clear and substantial danger of imminent injury by a patient or client to himself or another; and
"(5) For treatment or internal review purposes, to staff of the mental health facility where the patient is being cared for or to other health professionals involved in treatment of the patient."

10. Texas has a statute regarding confidentiality of mental health information that is much more precisely drawn. Tex. Mental Health Code Ann. art. 5561h, § 1–6 (Vernon 1979), uses the term

not determine the precise scope of the confidentiality provided in W.Va.Code, 27-3-1. It is sufficient for the purposes of this decision to hold that W.Va.Code, 27-3-1(a), provides for confidentiality of communications and information obtained in the course of treatment and evaluation of persons who may have mental or emotional conditions or disorders, subject to the exceptions set out in W.Va.Code, 27-3-1(b).[11]

■ W.Va.Code, 27-3-1(b),[12] specifies five situations where information otherwise deemed confidential may be disclosed. One of the exceptions is for proceedings under W.Va.Code, 27-6A-1, which relates to court-ordered mental examinations. This exception would permit disclosure of the results of such an examination by the examining professional. However, we do not believe the exception is broad enough to permit the examiner to automatically obtain information that is in the custody or control of third parties relative to the person's mental or physical condition. This was the action taken by Dr. Smith in unilaterally obtaining some of Dr. Hill's records relating to the defendant's mental condition.

We do, however, point out that access to records held by a third party can be obtained under W.Va.Code, 27-3-1(b)(3), which permits a court to order production of such material if it finds "that said information is sufficiently relevant to a proceeding before the court to outweigh the importance of maintaining the confidentiality established by this section." The State, however, did not request the court to make a finding under this exception in order to procure the medical information in the possession of Dr. Hill.

■ Thus, there may have been a violation of W.Va.Code, 27-3-1, when Dr. Smith secured the defendant's records that were prepared by Dr. Hill in the course of his treatment of her. However, we do not believe that this violation constitutes reversible error for several reasons. First, it appears that the defendant introduced most of her records prior to the direct examination of Dr. Hill and these would then have been available to Dr. Smith who testified later as the State's rebuttal witness. Second, we do not find nor does the defendant argue that there was any particular prejudice arising from the use of the records. Consequently, we find no reversible error as to this issue.[13]

## II.

The defendant argues that the court erred in refusing to give a defense instruction which in substance stated that if the jury believed the defendant was suffering from a mental illness it could consider this fact in determining whether "the prosecution has proved beyond a reasonable doubt that the defendant did in fact act with

"patient/client" which, in section 1(b), is defined as any person who is interviewed for "diagnosis, evaluation, or treatment of any mental or emotional condition or disorder, including alcoholism and other drug addiction." This statute is discussed in a comment, "The Psychotherapist-Patient Privilege in Texas," 18 Hous.L. Rev. 137 (1980). It is clear that the term "client" is used in the context of a client for medical services and does not refer to the attorney-client relationship. *See id.* at 144, n. 41.

11. We note that W.Va.Code, 27-3-2 (1978), provides a means for authorizing disclosure by a written consent, but this was not done in the present case:

"No consent or authorization for the transmission or disclosure of confidential information shall be effective unless it is in writing and signed by the patient or client by his legal

guardian. Every person signing an authorization shall be given a copy.

"Every person requesting such authorization shall inform the patient, client or authorized representative that refusal to give such authorization will in no way jeopardize his right to obtain present or future treatment except where and to the extent disclosure is necessary for treatment of said patient or client or for the substantiation of a claim for payment from a person other than the patient or client."

12. For the provisions of W.Va.Code, 27-3-1(b), see note 9, *supra*.

13. Although we find no reversible error in this case, we do not approve the practice of having the State obtain its court-ordered psychiatric examination from a psychiatrist who is associated with the defense psychiatrist.

premeditation, deliberation, and malice as those terms have been defined." [14]

We do not believe that the court erred in rejecting this instruction. It appears that the instruction is an attempt to utilize the diminished capacity defense. For purposes of this case, we need not decide whether a diminished capacity defense is available in our jurisdiction since even if it were, the defendant's proof did not meet that standard. [15]

Without attempting an extended discussion of the doctrine, it is sufficient to state that it is designed to permit a defendant to introduce expert testimony regarding his impaired mental condition to show that he was incapable of forming a specific criminal intent. Customarily, it is utilized to negate the elements of premeditation and deliberate intent in first-degree murder or malice aforethought in second-degree murder. [16] *E.g., United States v. Brawner,* 471 F.2d 969, 998 (D.C.App.1972) (en banc); *Hensel v. State,* 604 P.2d 222, 232 (Alaska 1979); *State v. Sikora,* 44 N.J. 453, 471, 210 A.2d 193, 203 (1965); *Commonwealth v. Walzack,* 468 Pa. 210, 217, 360 A.2d 914, 917 (1976); W. LaFave & A. Scott, Criminal Law § 42 (1972); Annot., 22 A.L.R.3d 1228 (1968). [17]

The reason for allowing a defendant to assert the defense of diminished capacity is to permit the jury to determine if the defendant should be convicted of some lesser degree of homicide because the requisite mental intent to commit first-degree or second-degree murder is not present by virtue of the defendant's mental disease or defect. [18]

**14.** The entire text of the instruction is:

"The jury is instructed that there is evidence in this case tending to show that the defendant was suffering from mental illness at the time of the alleged commission of the offense with which she is charged.

"This evidence is admitted because it may rule out the existence of a state of mind that is an essential element of the offense. In this case, as I have previously instructed, the prosecution must prove that the defendant acted with premeditation, deliberation, and malice. The question for you to decide is whether, in view of the evidence of mental illness, the prosecution has proved beyond a reasonable doubt that the defendant did in fact act with premeditation, deliberation, and malice as those terms have been defined. If this evidence has created a reasonable doubt whether the required state of mind on the part of the defendant existed, you must find her not guilty."

**15.** In an annotation in 22 A.L.R.3d 1228 (1968), the defense of diminished capacity is discussed. The case of *State v. Flint,* 142 W.Va. 509, 96 S.E.2d 677 (1957), is listed as rejecting the defense of diminished capacity. However, this Court discussed the question in terms of the existing insanity rule and concluded in Syllabus Point 5: "A person, though possessing subnormal mental capacity, is yet responsible for his criminal act if at the time of the act he knows right from wrong, and knows the nature and character of the particular act, and its probable consequences."

**16.** A number of commentators have discussed the diminished capacity defense. *E.g.,* Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage,* 77 Colum.L.Rev. 827 (1977);

Lewin, *Psychiatric Evidence in Criminal Cases for Purposes Other Than the Defense of Insanity,* 26 Syr.L.Rev. 1051 (1975); Morse, *Failed Explanations and Criminal Responsibility: Experts and the Unconscious,* 68 Va.L.Rev. 971 (1982); Rathke, *Abolition of the Mental Illness Defense,* 8 Wm. Mitchell L.Rev. 143 (1982); Note, 12 Cap. U.L.Rev. 167 (1982); *Note on the Abolition of Diminished Capacity as a Defense in California,* 5 Crim.Just.J. 325 (1982); *Johnson v. State—Diminished Capacity Rejected as a Criminal Defense,* 42 Md.L.Rev. 522 (1983).

**17.** A number of courts have found the defense to exist through the enactment of model penal code provisions. *E.g., People v. Gallegos,* 628 P.2d 999 (Colo.1981); *Commonwealth v. Gould,* 380 Mass. 672, 405 N.E.2d 927 (1980); *People v. Segal,* 54 N.Y.2d 58, 429 N.E.2d 107, 444 N.Y. S.2d 588 (1981).

Some courts have refused to adopt the defense. *E.g., State v. Doss,* 116 Ariz. 156, 568 P.2d 1054 (1977) (en banc); *Khaalis v. United States,* 408 A.2d 313 (D.C.App.1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980); *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (1982); *State v. Wilcox,* 70 Ohio St.2d 182, 436 N.E.2d 523 (1982).

**18.** A commonly quoted rationale for the rule is given in *United States v. Brawner,* 471 F.2d 969, 999 (D.C.App.1972) (en banc):

"Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condi-

**600**

In the present case, the defendant did not offer any psychiatric testimony to the effect that by virtue of some mental disease or defect, she was incapable of forming the specific intent required either for first-degree murder, i.e. premeditation, deliberate intent to kill, or for second-degree murder, i.e. malice aforethought. *See State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978).

The record reflects that Dr. Hill, who was the defendant's treating psychiatrist, testified that the defendant suffered from an anxiety neurosis. He gave no opinion on the insanity issue and was not asked whether her mental condition rendered her incapable of forming a specific intent to kill. The other defense witness was a clinical psychologist. He testified that the defendant did not have the mental capacity to appreciate the wrongfulness of her act and could not conform her actions to the requirements of the law. He was not asked as to her capacity to form the requisite specific intent elements. Consequently, we believe that even if we assume, *arguendo*, that a diminished capacity defense were available, the defendant did not meet its standard.

Furthermore, the instruction as worded was not a correct statement of the diminished capacity defense. The instruction stated that if the defendant was suffering from a mental illness at the time she allegedly committed the crime, then the jury could consider the mental illness on the question of whether she acted "with premeditation, deliberation, and malice." The existence of a mental illness is not alone sufficient to trigger a diminished capacity defense. It must be shown by psychiatric testimony that some type of mental illness rendered the defendant incapable of forming the specific intent elements. The instruction should require the jury to determine whether, in light of the mental condition, they believed that the defendant lacked the capacity to form the specific intent.

In Syllabus Point 3 of *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975), we stated this general rule with regard to refusing instructions:

"Proffered instructions which do not correctly state the law, which are at variance with the charge in the indictment, which are not supported by the evidence, or which are abstract, are erroneous and should be refused."

*See also State v. McCormick*, 166 W.Va. 800, 277 S.E.2d 629 (1981); *State v. Bolling*, 162 W.Va. 103, 246 S.E.2d 631 (1978). In view of the fact that the instruction was not supported by the evidence and did not correctly state the law, the circuit court properly refused it.

### III.

The defendant asserts several other points of error, which we do not find to be meritorious. The defendant argues that the trial court erred in allowing the State to play before the jury a tape-recorded statement, given by the defendant. On April 10, 1981, about two or three hours after the homicide, the defendant, who had already been arrested, gave a statement to a Wheeling police officer concerning the shooting incident.

Before trial, the circuit court ruled that the statement was voluntarily given, but would be inadmissible at trial because the statement was given after the defendant had requested the presence of a lawyer, which violated her fifth and sixth amendment rights. After the defendant had testified, the State sought to have the tape of the statement played before the jury in order to impeach the defendant's testimony. The trial court agreed that this would be proper impeachment under Syllabus Point 4 of *State v. Goodmon*, 170 W.Va. 123, 290 S.E.2d 260 (1981):

"Where a person who has been accused of committing a crime makes a voluntary statement that is inadmissible as evidence in the State's case in chief because the statement was made after the accused had requested a lawyer, the statement may be admissible solely for

tion, for which he was in no way responsible, negated his capacity to form a particular specific intent, even though the condition did not

exonerate him from all criminal responsibility."

impeachment purposes when the accused takes the stand at his trial and offers testimony contradicting the prior voluntary statement knowing that such prior voluntary statement is inadmissible as evidence in the State's case in chief."

*See also State v. Williams,* 171 W.Va. 556, 301 S.E.2d 187 (1983); *State v. Vance,* 168 W.Va. 666, 285 S.E.2d 437 (1981).

The defendant argues that the State played the tape before the jury not for purposes of impeachment but to demonstrate her mental capacity. A further argument is made that the statement did not contradict the defendant's testimony and therefore was not proper impeachment. It is clear from reviewing the record that the State's purpose in presenting the taped statement to the jury was to impeach the defendant. The trial court, upon the request of the defendant, gave a cautionary instruction to the jury after the tape was played, instructing it to consider the statement for impeachment purposes only.

▪ A comparison of the defendant's testimony with the statement reveals numerous contradictions and inconsistencies. For example, the defendant testified that prior to the shooting, she had been drinking, smoking marijuana, and taking quaaludes, but in the statement, the defendant denied being drunk or under the influence of drugs. The defendant testified at trial that her stepson told her on the telephone that the deceased and Sharon Horton were robbing her husband. In her statement, she stated that her stepson said the deceased was mauling and kissing her husband, with no mention of any robbery. The defendant's description of the shooting incident is more detailed in the statement than in her trial testimony. We, therefore, find no error committed by the trial court in allowing the statement to be played to the jury.

▪ Another assignment of error is that Daisy Rosenburger, who testified on behalf of the defendant, should have been allowed to testify as to a statement made by the victim, Ms. Rudolph, several hours prior to the shooting. Ms. Rudolph allegedly stated, "I'm going down [to the Play-

mate] and I'm going to call Betty Simmons because I know she's going to come after me." The defendant contends that this statement would tend to show that the deceased wanted to provoke a confrontation or to agitate the defendant.

It is not disputed that the defendant was never informed that the deceased made such a statement prior to the crime. Nor is it disputed that the defendant, along with several of her witnesses, testified at some length as to the deceased's course of conduct calculated to harass and humiliate the defendant.

The remark is hearsay, since it was a third party's attempt to testify "in court with regard to out-of-court statements of another for the purpose of proving the truth of the matter asserted." Syllabus Point 9, in part, *State v. Richey,* 171 W.Va. 342, 298 S.E.2d 879 (1982).

▪ Even if we were to assume that such statement could be admitted as a statement of present mental intent, *see Gault v. Monongahela Power Co.,* 159 W.Va. 318, 223 S.E.2d 421 (1976); F. Cleckley, Handbook on Evidence for West Virginia Lawyers 406 (1978); McCormick on Evidence § 294 (1972), it was cumulative because the defendant along with several of her witnesses testified as to the victim's harassment of the defendant. Therefore its rejection would not be reversible error. *State v. Whitt,* 129 W.Va. 187, 192, 40 S.E.2d 319, 322 (1946).

▪ The defendant also assigns as error that the trial court unreasonably rejected some of the defendant's proposed *voir dire* questions. An examination of the questions submitted by the defendant reveals that the few questions that were refused by the trial court were substantially covered by other questions that were used in the *voir dire.* Therefore, we find no error on this point.

▪ Finally, the defendant generally argues that the trial court should have granted her motion for acquittal. We believe there was sufficient evidence to support the jury's verdict of second-degree

murder and we, therefore, conclude that no error was committed.

The verdict of the Circuit Court of Ohio County is affirmed.

Affirmed.