590 S.E.2d 718

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Robert Bradley JOSEPH, Defendant Below, Appellant.**

**No. 31313.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 18, 2003.

Decided Dec. 10, 2003.

---

E. Dixon Ericson, John R. Mitchell, Sr., John R. Mitchell, L.C., Charleston, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, John Blevins, Assistant Attorney General, Charleston, for the Appellee.

DAVIS, Justice:

Mr. Robert Joseph, defendant below and appellant herein, appeals from a conviction of first degree murder with mercy. He contends that the circuit court erred in excluding expert testimony offered by the defense to show that he suffered from a diminished capacity that prevented him from forming the requisite mental state for the commission of first or second degree murder. We first conclude that the diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. In addition, we find that the evidence offered by Mr. Joseph was sufficient to allow his diminished capacity theory to go to the jury. Accordingly, his conviction is reversed and this case is remanded for a new trial.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Stated briefly, the relevant facts are as follows. On the night of Wednesday, March 28, 2001, the defendant, Robert Bradley Joseph (hereinafter "Mr. Joseph"), was socializing in his home with Jessica Martin (hereinafter "Ms. Martin"), an eighteen year-old female, and Duane Lucas (hereinafter "Mr. Lucas"). The three spent the evening drinking beer and listening to music until the early hours of the morning.[1] During the course of the evening, Ms. Martin rejected advances made by Mr. Joseph and she began flirting with Mr. Lucas. At approximately 4:00 a.m., Mr. Joseph became angry at the rejection and ordered Ms. Martin to leave the house. She left accompanied by Mr. Lucas. As the two departed, Mr. Joseph went out onto the porch of his home and fired two shots.[2] No one was injured by the shots.

Mr. Joseph testified that he became concerned about Ms. Martin and decided to look for her. He first drove to her grandmother's house where he encountered Ms. Martin's boyfriend, Richard Hackney (hereinafter "Mr. Hackney"). The two men then drove to the home of the victim, Mr. Scott Light (hereinafter "Mr. Light"). Mr. Light was not home, but his girlfriend explained that he had driven Ms. Martin and Mr. Lucas "down the road." Mr. Joseph then drove away from the house, but saw Mr. Light's vehicle approaching and turned around and followed Mr. Light into his driveway. Messrs. Joseph and Hackney got out of their vehicle and Mr. Joseph questioned Mr. Light about Ms. Martin's whereabouts. Mr. Light first denied that he knew where Ms. Martin was, but then admitted that he had driven Ms. Martin and Mr. Lucas to the mouth of the hollow. Upon hearing this, Mr. Joseph returned to his truck and spun his tires in Mr. Light's driveway. Mr. Light yelled at him to stop the truck. Mr. Light then walked over to Mr. Joseph's truck, pulled the driver's door open, and the two men argued. During the argument, Mr. Light pointed his finger at Mr. Joseph and Mr. Joseph slapped his hand away. According to Mr. Joseph, Mr. Light then struck or slapped him on the left side of the head. Mr. Joseph testified that, upon being slapped, he saw a "blue flash," and his hand landed on a .22 caliber pistol that was lying on the seat of his truck. Mr. Joseph grabbed the pistol and fired five shots into Mr. Light, mortally wounding him. Mr.

---

1. Mr. Joseph and Mr. Lucas had also shared a marijuana cigarette earlier in the evening. In addition, Mr. Joseph had been prescribed the drugs Paxil, Celexa, and Neurontin (a mood stabilizing medication).

2. Mr. Joseph claims the shots were fired from a "deer rifle," while Ms. Martin and Mr. Lucas described the weapon as a .22 caliber pistol.

Light fell to the ground. Then Mr. Joseph backed his vehicle over Mr. Light in his hasty attempt to leave the premises. Mr. Joseph then drove to his parents home where he called 911 and advised the operator that he had shot Mr. Light and requested assistance. He unloaded his pistol and waited at the kitchen table for the police to arrive.

Several years before the above described incident, in July 1989, Mr. Joseph was involved in a motorcycle accident.[3] Among the serious injuries Mr. Joseph sustained in the accident was a crush injury to his left frontal skull.[4]

Mr. Joseph was charged with first-degree murder in connection with Mr. Light's death, and was tried by jury. Mr. Joseph sought to assert the defense of diminished capacity resulting from the brain injury sustained in his motorcycle accident of 1989. He offered the testimony of three doctors in support of this defense. One doctor, Dr. John Beard, is a doctor of osteopathy who had treated Mr. Joseph at Sharpe Hospital in August 2000, after Mr. Joseph had been hospitalized for treatment of his threatening behavior and substance abuse following a DUI arrest. The second doctor, Dr. Mark A. Hughes, is a board certified psychiatrist who practices at Shawnee Hills and Highland Hospital. Dr. Hughes saw Mr. Joseph professionally on August 29, 2000, and a number of times thereafter. Finally, Mr. Joseph offered the expert testimony of Dr. Robert W. Solomon, Ed.D., a forensic psychologist.

The circuit court heard testimony from each of these doctors *in camera*. The circuit court then ruled that, although West Virginia has recognized the defense of diminished capacity, the testimony of the three doctors was insufficient upon which to base the defense. Therefore, the court excluded the testimony of these three witnesses.

At the close of all the evidence, Mr. Joseph was convicted of first degree murder with a recommendation of mercy. Mr. Joseph filed a motion to set aside the verdict alleging, in

relevant part, that the circuit court improperly excluded the testimony of the aforementioned doctors. By order entered June 3, 2002, the circuit court denied the motion and found

1) ... the defendant would be permitted to introduce the defense of diminished capacity if the defendant could show that he was suffering from a mental disease or defect such that he was incapable of formulating an intent to kill, premeditation or malice.

2) That the defendant presented expert testimony as to a diminished capacity defense, "in camera".

3) That the defendant's experts testified that the defendant did not suffer a mental disease or defect which would prevent him from formulating the necessary elements of the crime charged in the indictment.

4) That the defendant's psychologist, Dr. Solomon, testified that while the defendant was capable of formulating an intent to kill, malice and premeditation, that he believed under the circumstances of this particular case, the rapidity of the situation prevented the defendant from formulating malice or premeditation.

5) That whether or not the defendant acted with malice or premeditated on a particular occasion were issues for jury determination.

6) That absent expert testimony that the defendant was incapable of formulating the necessary elements, by virtue of disease or defect, the defense of diminished capacity was properly excluded by the Court.

7) That the defendant offered no evidence of diminished capacity based on drug or alcohol induced intoxication.

By order entered June 6, 2002, the circuit court sentenced Mr. Joseph to life in the state penitentiary with a recommendation of mercy. It is from this order that Mr. Joseph now appeals.

---

**3.** Mr. Joseph was twenty-three years old at the time of the motorcycle accident.

**4.** Mr. Joseph also suffered a fractured spine, fractures of his left eye socket, nose and jaw, and injuries to his left shoulder and leg that resulted in atrophy and loss of use of his left arm and mild left leg impairment.

## II.

### STANDARD OF REVIEW

■■■■ Mr. Joseph's "MOTION TO SET ASIDE VERDICT" was, in essence, a motion for a new trial. We have previously explained that

"[a]ccording to Rule 33 of the West Virginia Rules of Criminal Procedure [(1995)], "[t]he court on motion of a defendant may grant a new trial to [that defendant] if required in the interest of justice." "The question of whether a new trial should be granted is within the discretion of the trial court and is reviewable only in the case of abuse." *State v. Crouch,* 191 W.Va. 272, 275, 445 S.E.2d 213, 216 (1994) (citation omitted)."

*State v. Helmick,* 201 W.Va. 163, 167, 495 S.E.2d 262, 266 (1997) (footnote omitted). More particularly, however, we are asked resolve the legal question of whether to adopt a diminished capacity defense in West Virginia. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995). Finally, we are asked to review the circuit court's decision on the admissibility of expert witness testimony. In this regard, we have repeatedly held:

" 'The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.' Syllabus Point 6, *Helmick v. Potomac Edison Co.,* 185 W.Va. 269, 406 S.E.2d 700 (1991), *cert. denied,* 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991)." Syllabus point 1, *West Virginia Division of Highways v. Butler,* 205 W.Va. 146, 516 S.E.2d 769 (1999).

Syl. pt. 1, *Watson v. Inco Alloys Int'l, Inc.,* 209 W.Va. 234, 545 S.E.2d 294 (2001). With due consideration for the foregoing standards, we proceed to address the issues raised in this appeal.

## III.

### DISCUSSION

At the core of this appeal is the question of whether the circuit court properly applied the diminished capacity defense asserted by Mr. Joseph in reaching its conclusion to exclude the medical testimony offered by Mr. Joseph in support of that defense. Before deciding this issue, however, we must first determine whether the defense of diminished capacity is available in West Virginia.

### A. Diminished Capacity

In this case, the circuit court found that the diminished capacity defense was available in West Virginia. Neither Mr. Joseph nor the State find fault in this ruling. They both agree that diminished capacity has been recognized by this Court, although it has never been expressly adopted. Today, we decide whether to expressly adopt a diminished capacity rule.

Generally stated, what is sometimes referred to as the diminished capacity defense allows "a defendant to offer evidence of his mental condition with respect to his capacity to achieve the mens rea or intent required for commission of the offense charged." 21 Am.Jur.2d *Criminal Law* § 38, at 151 (1998) (footnote omitted). *See also New Jersey v. Nataluk,* 316 N.J.Super. 336, 343, 720 A.2d 401, 405 (App.Div.1998) (" 'diminished capacity is a "failure of proof" defense: evidence of defendant's mental illness or defect serves to negate the *mens rea* element of the crime.' " (quoting *State v. Reyes,* 140 N.J. 344, 354, 658 A.2d 1218, 1223 (1995))); *State v. Warden,* 133 Wash.2d 559, 564, 947 P.2d 708, 711 (1997) ("Diminished capacity is a mental condition not amounting to insanity which prevents the defendant from possessing the requisite mental state necessary to commit the crime charged." (citation omitted)).

■■■ One rationale for allowing the defense arises from due process. It is a foundation of criminal law that "[t]he State must prove all the elements of a crime beyond a reasonable doubt." *State v. Less,* 170 W.Va. 259, 264, 294 S.E.2d 62, 66 (1981) (citing *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Pinkerton v. Farr,* 159

W.Va. 223, 220 S.E.2d 682 (1975)). Included in these elements the State must prove is the mental state associated with the crime charged. One court has explained

it would be a violation of due process to require the prosecution to establish the culpable mental state beyond a reasonable doubt while, at the same time, to prohibit a defendant from presenting evidence to contest this issue. Such a prohibition assumes all the features of an impermissible presumption of culpability. While it may be permissible to permit a jury to infer an essential ingredient of a crime from a proven fact so long as there is a rational connection between the proven fact and the inferred fact, *e.g. Barnes v. United States,* 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *Tot v. United States,* 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), it is quite another matter to insulate this ingredient from disproof by defense evidence. A rule precluding the defendant from contesting the culpability element of the charge would render the prosecution's evidence on that issue uncontestable as a matter of law, in derogation of the presumption of innocence and the constitutional requirement of prosecutorial proof of guilt beyond a reasonable doubt. *E.g., Sandstrom v. Montana,* 442 U.S. [510,] 520–24, 99 S.Ct. [2450,] 2457–59, 61 L.Ed.2d [39,] 48–51 [(1979)]; *Morissette v. United States,* 342 U.S. [246,] 274–75, 72 S.Ct. [240,] 255–56, 96 L.Ed. [288,] 306–07 [(1952)].

*Hendershott v. Colorado,* 653 P.2d 385, 391 (Colo.1982). *See also United States v. Pohlot,* 827 F.2d 889, 900–01 (3d Cir.1987) ("due process requires that the government prove every element of a criminal offense beyond a reasonable doubt. The defendant's right to present a defense to one of those elements generally includes the right to the admission of competent, reliable, exculpatory evidence .... [A] rule barring evidence on the issue of mens rea may be unconstitutional so long as we determine criminal liability in part through subjective states of mind." (footnote omitted)); *People v. Carpenter,* 464 Mich. 223, 242–43, 627 N.W.2d 276, 286 (2001) (Kelly, J., dissenting) (disagreeing with the majority's rejection of the diminished capacity defense and commenting that "[a]lthough an accused has no absolute right to present evidence relevant to his defense, a limitation on his ability to present a defense may, under some circumstances, violate due process.... Rules excluding evidence contravene the due process right to present a defense when they infringe a weighty interest of an accused or significantly undermine a fundamental element of the defense."); *State v. Delibero,* 149 N.J. 90, 98, 692 A.2d 981, 986 (1997) ("A jury considers evidence of diminished capacity in relation to the State's burden to prove the essential elements of the crime." (citation omitted)).

Thus, it is somewhat confusing to refer to diminished capacity as a "defense." As one court has observed, "the term[ ] ... 'diminished capacity' do[es] not have a clearly accepted meaning in the courts." *Pohlot,* 827 F.2d at 903. The *Pohlot* court also noted that "[a]lthough this principle has sometimes been phrased as a version of the 'diminished capacity defense,' it does not provide any ground for acquittal not provided in the definition of the offense. Properly understood, [diminished capacity is] not a defense at all but merely a rule of evidence." *Id.* at 897 (footnote omitted). Indeed, it is important to note that, unlike the insanity defense, evidence of diminished capacity does not establish a complete defense. As one commentator has explained,

It has been said that diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but is most likely guilty of a lesser included offense; thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime he or she actually committed.

21 Am. Jur. *Criminal Law* § 38, at 152 (footnote omitted). *See also Commonwealth v. Porter,* 556 Pa. 301, 316 n. 6, 728 A.2d 890, 897 n. 6 (1999) ("Diminished capacity is an extremely limited defense. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 28, 454 A.2d 937, 943 (1982). In asserting a diminished capacity defense, a defendant is attempting to

prove that his [or her] mental condition at the time of the crime was such that he [or she] was *incapable* of forming the specific intent to kill. If the defendant is successful, first degree murder is mitigated to third degree. *Commonwealth v. Faulkner,* 528 Pa. 57, 70 n. 4, 595 A.2d 28, 35 n. 4 (1991)").

Numerous courts have allowed some form of diminished capacity defense. *See, e.g., Pohlot,* 827 F.2d at 897; *Hendershott v. Colorado,* 653 P.2d 385; *State v. Gracewski,* 61 Conn.App. 726, 767 A.2d 173 (2001); *New Jersey v. Delibero,* 149 N.J. 90, 692 A.2d 981 (1997); *Commonwealth v. Weaver,* 500 Pa. 439, 457 A.2d 505 (1983); *State v. Warden,* 133 Wash.2d 559, 947 P.2d 708 (1997). *See generally* Model Penal Code § 4.02(1) (1985) ("Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind that is an element of the offense.").

A review of West Virginia case law reveals that this Court has all but expressly recognized the use of evidence of a diminished capacity resulting from a mental disease or defect to negate the mental state of the crime charged. We have, heretofore, allowed evidence of voluntary intoxication to show that a defendant was incapable of forming the required mental state for first degree murder. In *State v. Keeton,* 166 W.Va. 77, 82–83, 272 S.E.2d 817, 820 (W.Va.1980), this Court observed that "[w]hile it is true that voluntary drunkenness does not ordinarily excuse a crime, . . . it may reduce the degree of the crime or negative a specific intent." (Citation omitted). The Court also commented that it had generally held that "the level of intoxication must be 'such as to render the accused incapable of forming an intent to kill, or of acting with malice, premeditation or deliberation.'" *Id.* at 83, 272 S.E.2d at 821 (quoting syllabus point 1, *State v. Davis,* 52 W.Va. 224, 43 S.E. 99 (1902)). *See also State v. Brant,* 162 W.Va. 762, 252 S.E.2d 901 (1979) (finding that level of intoxication so incapacitated defendant that giving of first-degree and second-degree murder instructions was erroneous, but cautioning that case presented unique factual circumstances not likely to arise again).

It would be inequitable to allow evidence of a diminished capacity where voluntary intoxication is involved, yet deny such evidence where an organic brain injury or other brain injury or disease is involved. This point was observed by Justice Miller in *State v. Simmons,* 172 W.Va. 590, 599–600 n. 18, 309 S.E.2d 89, 98 n. 18 (1983):

> "Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condition, for which he was in no way responsible, negated his capacity to form a particular specific intent, even though the condition did not exonerate him from all criminal responsibility."

(quoting *United States v. Brawner,* 471 F.2d 969, 999 (D.C.Cir.1972) (*en banc*)). In *Simmons,* this court affirmed the circuit court's denial of a diminished capacity instruction. Justice Miller discussed the diminished capacity doctrine, but found it was unnecessary to adopt its principles under the circumstances presented as the evidence did not support the defense. The Court's discussion, however, demonstrates an interpretation of the doctrine commensurate with the authorities cited earlier in this opinion. The *Simmons* Court explained that the diminished capacity doctrine "is designed to permit a defendant to introduce expert testimony regarding his impaired mental condition to show that he was incapable of forming a specific criminal intent. Customarily, it is utilized to negate the elements of premeditation and deliberate intent in first-degree murder or malice aforethought in second-degree murder." 172 W.Va. at 599, 309 S.E.2d at 98 (citations omitted). The Court elaborated that

> "[t]he reason for allowing a defendant to assert the defense of diminished capacity is to permit the jury to determine if the defendant should be convicted of some lesser degree of homicide because the requisite mental intent to commit first-degree or second degree murder is not present by

virtue of the defendant's mental disease or defect."

*Id.*, 309 S.E.2d at 98 (footnote omitted). The court cautioned, however, that "[t]he existence of a mental illness is not alone sufficient to trigger a diminished capacity defense. It must be shown by psychiatric testimony that some type of mental illness rendered the defendant incapable of forming the specific intent elements." *Id.* at 600, 309 S.E.2d at 99.

Finally, in *State v. DeGraw*, 196 W.Va. 261, 470 S.E.2d 215 (1996), this Court acknowledged that the defendant had presented a diminished capacity defense below, but provided no analysis of the defense. Nevertheless, syllabus point 3 of *DeGraw* implicitly recognized the defense by stating:

> When a defendant offers the testimony of an expert in the course of presenting a defense such as the insanity defense *or the diminished capacity defense*, which calls into question the defendant's mental condition at the time the crime occurred, and the expert's opinion is based, to any appreciable extent, on the defendant's statement to the expert, the State may offer in evidence a statement the defendant voluntarily gave to police, which otherwise is found to be inadmissible in the State's case-in-chief, solely for impeachment purposes either during the cross-examination of the expert or in rebuttal, even though the defendant never takes the witness stand to testify.

(Emphasis added).

■■■ Based upon the prior opinions of this Court indicating approval of a diminished capacity rule, and based upon the additional authorities discussed above, we hold that the diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. This defense is asserted ordinarily when the offense charged is a crime for which there is a lesser included offense. This is so because the successful use of this defense renders the defendant not guilty of the particular crime charged, but does not preclude a conviction for a lesser included offense.[5] We now apply this holding to the case *sub judice*.

### B. Expert Testimony

Mr. Joseph argues that the circuit court erred in excluding the testimony of his treating physicians and expert witness, Dr. Solomon. The State contends that the circuit court did not err in excluding the doctors' testimony in this case as their testimony failed to establish that Mr. Joseph suffered from a diminished capacity.

Dr. Solomon made the following relevant comments during his *in camera* testimony:

> All the indications . . . pointed to me that he had suffered frontal lobe damage, that his long-term knowledge was intact but he underwent tremendous personality change along with the other things I talked about.
>
> . . . .
>
> He knows where he is, who he is, what time of day it is, what month it is. All of those things are within normal limits. It's the executive functions that I found to be diminished to show a great loss.
>
> . . . .
>
> Under the circumstances that existed there that morning, I think his ability to plan, organize, carry out decision-making processes were extremely flawed due to his brain injury. In other circumstances the situation might be different.
>
> . . . .
>
> Given those circumstances, I think his ability to plan and carry out a premeditated plan of action would have been diminished.
>
> . . . .
>
> I can say yes, I think within a scientific certainty that his capacity was diminished during that particular time frame.

**5.** We note that evidence of a defendant's diminished capacity may also be relevant at sentencing.

Q. And that was the capacity to premeditate, to intend, and to have malice; is that correct?

A. Yes. Given those circumstances, that's correct.

Dr. Solomon also acknowledged that in his report he expressed his opinion that "within a reasonable scientific probability ... Mr. Robert Joseph was operating under an involuntary state of diminished capacity and that this tragic shooting happened without malice due to his diminished capacity." Finally, the circuit court asked Dr. Solomon to clarify his position, and stated "[y]ou're saying ... that he's suffering from some mental defect which precludes him from being able to formulate intent or malice or to premeditate under these circumstances. Is that correct?" To which Dr. Solomon answered, "I think that's a pretty correct phrases (phonetic) of what I'm trying to say."

At the conclusion of Dr. Solomon's in camera testimony, the circuit court stated on the record that:

When you look at the evidence here of ... Dr. Solomon ... [he does not] indicate that this defendant is incapable by virtue of mental disease or defect of forming an intent to kill, malice, or premeditation.... He [Dr. Solomon] did not indicate that he [Mr. Joseph] could not formulate intent, could not act maliciously or could not act with premeditation. In fact, he [Dr. Solomon] indicated that he [Mr. Joseph] could do all of those things, but that under the facts in this case, or under the circumstance here he [Dr. Solomon] did not believe that the defendant had acted with malice, and he [Dr. Solomon] believed that under these circumstances that the defendant's ability to premeditate had been diminished....

.... It's my finding that there has to be a disease or defect, and I think for purposes of my rulings I will accept that there is some type of defect as a result of the accident. I'll accept that for purposes of

these rulings. But that has to make him incapable of being able to premeditate or to formulate intent or malice.

Dr. Solomon concentrated his opinion, based on the circumstances in this case, and it's my finding that that's not sufficient; that whether or not he acted with premeditation or malice or intent to kill in this case is something the jury is ultimately going to have to decide. But there was not evidence of a mental disease or defect that made him incapable of forming those mental elements.

In its final order denying Mr. Joseph's motion to set aside the verdict, the circuit court reiterated "[t]he defendant's psychologist, Dr. Solomon, testified that while the defendant was capable of formulating an intent to kill, malice and premeditation, that he believed under the circumstance of this particular case, the rapidity of the situation prevented the defendant from formulating malice or premeditation." The circuit court went on to state that "whether or not the defendant acted with malice or premeditated on a particular occasion were issues for jury determination."

▆▆▆ We find that the circuit court erred in its application of the diminished capacity doctrine. The circuit court apparently interpreted the diminished capacity defense as requiring a complete inability to form the necessary mental elements of a crime. On the contrary, "[a] defendant who raises a diminished capacity defense ... challenges his capacity to premeditate and deliberate *at the time of the criminal act.*" *Commonwealth v. Brown,* 396 Pa.Super. at 181–82, 578 A.2d at 466 (emphasis added). While the circuit court misperceived the rule, we note that it was not necessarily unreasonable for the court to reach its conclusion given that there was no explicit statement of the rule in West Virginia at the time the circuit court ruled on the issue. We have corrected this absence by our holding today.[6] Since it was

---

**6.** To the extent that the circuit court's final order may be interpreted as indicating that Dr. Solomon's testimony was excluded, in part, based upon the case of *State v. McFarland,* 175 W.Va. 205, 332 S.E.2d 217 (1985), because Dr. Solomon's conclusions addressed an ultimate issue to

be decided by the jury, such a conclusion is erroneous. In *McFarland,* this Court found that expert witness testimony was inadmissible as it related to the ultimate issue of the case. However, *McFarland* was decided before the adoption of the West Virginia Rules of Evidence and was

proper for Dr. Solomon to offer an opinion as to Mr. Joseph's mental abilities at the time of the commission of the crime charged, we must now determine whether Dr. Solomon's conclusions regarding Mr. Joseph's mental capacity were sufficient to support a claim of diminished capacity.

As discussed above, this Court in *State v. Simmons*, concluded that the expert testimony offered by the defendant did not meet the standard for a diminished capacity defense. In that case we related that "the defendant did not offer any psychiatric testimony to the effect that by virtue of some mental disease or defect, she was incapable of forming the specific intent required either for first-degree murder, i.e. premeditation, deliberate intent to kill, or for second-degree murder, i.e. malice aforethought." 172 W.Va. at 600, 309 S.E.2d at 99. The court went on to explain that the treating psychiatrist "was not asked whether [the defendant's] mental condition rendered her incapable of forming a specific intent to kill." *Id.*, 309 S.E.2d at 99. Similarly, a second defense witness "was not asked as to [the defendant's] capacity to form the requisite specific intent elements." *Id.*, 309 S.E.2d at 99.

In the case of *New Jersey v. Nataluk,* 316 N.J.Super. at 345–46, 720 A.2d at 406, the Superior Court of New Jersey, Appellate Division, found that the defendant had offered sufficient evidence to allow the question of the defendant's diminished capacity to go to the jury where the defendant's expert testified that "in his judgment, defendant was not aware of what he was doing when he possessed the gun and fired the bullets through the window. He believed that defendant had blacked out and did not even know that he had fired the gun." The New Jersey court found this evidence, if accepted,

demonstrated that the "defendant would not be guilty of the crimes charged because he would not have acted knowingly or purposefully," which were the mental elements of the crime for which the defendant had been charged. *Id.* at 346, 720 A.2d at 406.

▮ The instant case is more akin to *Nataluk.* Dr. Solomon's testimony was addressed directly to Mr. Joseph's mental capacity at the time of his criminal offense and Dr. Solomon opined that Mr. Joseph was, due to his mental defect, unable "to formulate intent or malice or to premeditate under these circumstances." Thus, in the instant case, there plainly was sufficient evidence to allow Dr. Solomon to testify before the jury. Accordingly, the circuit court was clearly wrong in excluding this evidence and prohibiting Mr. Joseph from presenting his defense attacking the State's case in chief.[7] For this reason, Mr. Joseph's conviction must be overturned and this case remanded for a new trial.

## IV.

## CONCLUSION

For the reasons stated in the body of this opinion, we find the circuit court abused its discretion in denying Mr. Joseph a new trial. Therefore, the circuit court's order denying Mr. Joseph's motion to set aside the verdict is reversed. This case is remanded for a new trial consistent with this opinion.

Reversed and remanded.

---

superceded by those rules. It is no longer the law that an expert may not testify on an ultimate issue. Indeed, Rule 704 of the West Virginia Rules of Evidence expressly states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."

7. We likewise find that the testimony of Drs. Beard and Hughes should have been admitted insofar as it established that Mr. Joseph suffered

from a mental impairment for which he required hospitalization and treatment. While the testimony provided by these two doctors, in and of itself, was inadequate to negate the State's evidence of the intent element of the murder for which Mr. Joseph was charged, their testimony was relevant in establishing that Mr. Joseph suffered from a mental impairment for which he was hospitalized a short time prior to committing the murder, and which affected his cognitive abilities, i.e. his ability to reason and think things through.