# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No. 17-0099** (Randolph County 15-F-94)

**Derrick William Adamson,**
**Defendant Below, Petitioner**

**FILED**

**March 9, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Derrick William Adamson, by counsel J. Brent Easton, appeals following a jury trial resulting in convictions for first degree murder, grand larceny, and possession of a stolen vehicle. By order entered on January 5, 2017, the circuit court sentenced petitioner to life in prison without the possibility of parole for first-degree murder, one to ten years for grand larceny, and one to five years for possession of a stolen vehicle, with the sentences for grand larceny and possession of a stolen vehicle to run concurrently to one another, but consecutively to the life sentence for murder. Respondent State of West Virginia, by counsel Mary M. Downey, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

### Factual and Procedural Background

In 2015, a Randolph County Grand Jury indicted petitioner for the first degree murder of Donavan Nicholson, grand larceny, possession of a stolen vehicle, and receiving or transferring stolen goods.[1] The circuit court commenced a jury trial in October of 2016. The evidence at trial revealed that at approximately 11:30 p.m. on April 20, 2015, two City of Elkins police officers responded to a call from the Mountaineer Mart convenience store regarding possible gunshots. The officers spoke with the store manager, who described two males who had been in the parking lot. The officers left the scene to search for the men based on the descriptions given.

---

[1]The grand jury also indicted petitioner for attempted first degree murder and wanton endangerment involving a firearm related to a separate victim on the same night of the murder of Donavan Nicholson. On petitioner's motion, the circuit court severed these two charges from the charges that are relevant to the instant appeal.

1

About twelve minutes later, the officers encountered petitioner, who matched the description given by the store manager, at a nearby railroad station. The officers searched petitioner and found a box of .25-caliber bullets, some of which were missing. At this time, however, the officers received a call regarding an unrelated burglary in process and left petitioner. The officers returned to the Mountaineer Mart about twenty minutes later and spoke with the manager again. She informed the officers that the other male who had been with petitioner earlier, Timothy Summerfield, was present. Mr. Summerfield told the officers that he had had a short conversation with petitioner at the Mountaineer Mart earlier, during which petitioner pulled out a small pistol, fired at him and missed, and then the pistol jammed. Mr. Summerfield told the officers that petitioner then shook his hand, told Mr. Summerfield "[i]t wasn't your day," and walked away.

While still at the Mountaineer Mart, the officers received a call from a nearby GoMart convenience store regarding a stolen vehicle. The officers viewed the surveillance video from the GoMart and identified petitioner as the driver of the alleged stolen vehicle, a 2006 Ford Five Hundred, gold in color. By this time, it was in the early morning hours of April 21, 2015. The officers began a foot patrol of the area between the GoMart and the Mountaineer Mart. At approximately 4:00 a.m., one of the officers discovered the body of Donavan Nicholson behind the railroad station. He had been shot once in the head. The officers located a .25-caliber bullet casing near the body. The officers issued a "be on the lookout" for the stolen car and petitioner.

At about 11:36 a.m. on April 21, 2015, a West Virginia State Police trooper located petitioner driving the stolen Ford Five Hundred in Webster County and stopped the vehicle. Petitioner was wearing body armor and had a .25-caliber pistol in the vehicle. After backup for the trooper arrived at approximately 11:45 a.m., the trooper read petitioner his *Miranda* rights and placed him in the backseat of the State Police cruiser. Petitioner then voluntarily gave a recorded statement that lasted about eight minutes in which petitioner indicated that he was worried about his eleven-year-old daughter, whom he believed was missing and had been killed. Petitioner then disclosed that he shot and killed Mr. Nicholson because he believed he killed petitioner's daughter. However, this was untrue; petitioner's daughter was not missing and was alive. Petitioner and Mr. Nicholson had no prior knowledge of one another. The State Police then transported petitioner to a magistrate, arriving at 12:55 p.m.

In addition to the involved officers, the State presented the testimony of Richard Foresi, a college student who encountered petitioner walking through Elkins at approximately 11:00 p.m. on April 20, 2015. Mr. Foresi did not know petitioner. He described petitioner as behaving in a "bizarre" manner; that "it was pretty clear that there was definitely something – something wrong with him[;]" and that petitioner "appeared to be under the influence of something." Additionally, GoMart clerk Teresa Miller testified that petitioner had been in the store around 6:00 or 7:00 p.m. on April 20, 2015, and then again around 10:00 p.m. She testified that petitioner did not purchase anything, but asked to borrow a screwdriver and some bandages. She described petitioner as "preoccupied" and "suspicious of his surroundings."

At trial, petitioner conceded that he shot and killed the victim; however, he attempted to persuade the jury that he was guilty of second degree murder. In his defense, petitioner called Dr. Timothy Saar regarding his alleged diminished capacity and its effect on petitioner's ability to

premeditate and deliberate the killing, necessary elements for a first degree murder conviction. Dr. Saar testified that petitioner had a history of substance-induced psychosis, which led to his commitment to Sharpe Hospital in Weston, West Virginia, in 2007. According to petitioner's records, petitioner had also been treated at Ohio State University Medical Center in 2011 and 2014 for "paranoid and incoherent" behavior, during periods in which he had consumed substances. Based on petitioner's mental health history, his report of using methamphetamine and alcohol in the days leading up to and including April 20 and 21, 2015, and the fact that petitioner did not know Mr. Nicholson, Dr. Saar concluded that petitioner lacked the ability to premeditate and deliberate the killing. In rebuttal, the State relied upon Dr. David Clayman, who acknowledged petitioner's mental health records, but suspected petitioner of malingering. Dr. Clayman concluded that petitioner possessed the capacity to form intent and malice at the time of the killing.

At the conclusion of the three-day trial, the jury found petitioner guilty of first degree murder, grand larceny, and possession of a stolen vehicle, and did not recommend mercy at sentencing. The jury acquitted petitioner of receiving or transferring stolen property. By order entered on December 23, 2016, the circuit court denied petitioner's motions for judgment of acquittal and for a new trial. Subsequently, the circuit court sentenced petitioner as set forth above. This appeal followed.

## Discussion

On appeal, petitioner raises the following six assignments of error: (1) the circuit court denied petitioner a fair and impartial jury panel because the court refused to question, or permit counsel to question, prospective jurors regarding their understanding of a mercy recommendation; (2) the State presented insufficient evidence of premeditation and deliberation; (3) the circuit court subjected petitioner to multiple punishments in violation of double jeopardy and due process principles by allowing the State to pursue both grand larceny and possession of a stolen vehicle charges; (4) the admission of petitioner's statement to law enforcement violated the prompt presentment rule; (5) the circuit court should have granted a mistrial based on prosecutor's description of the killing as an "execution;" and (6) the admission of the incident between Mr. Summerfield and petitioner violated Rule 404(b) of the West Virginia Rules of Evidence. We address petitioner's arguments in turn.

Petitioner's first assignment of error is that the circuit court refused to question, or permit counsel to question, prospective jurors regarding their understanding of a mercy recommendation upon a guilty verdict of first degree murder. Petitioner sought to inquire in voir dire whether the panel fully understood that eligibility for parole after fifteen years was not absolute, i.e., that it did not mean that petitioner would automatically be released after fifteen years if the jury recommended mercy. The circuit court declined petitioner's request to delve into the details of parole eligibility and instead made the following inquiry, to which petitioner noted an objection:

> Ladies and gentlemen, are any of you aware of any conscientious objection you
> may have to returning a verdict of first degree murder if, that is, the evidence that
> you believe – the verdict that you believe is appropriate based upon the evidence,
> if you realize that in doing so there may be – you also have the opportunity to

3

determine whether or not mercy is recommended or whether no mercy is recommended. With the idea that no mercy means the defendant could be incarcerated for life. Mercy would indicate that he would have the opportunity to be paroled. Do you understand that? Do you think that there's – does anyone here believe that they would have any conscientious objection to rendering a verdict given those circumstances?

It is undisputed that no one on the panel voiced a concern. However, petitioner contends that the court's inquiry did not probe into whether the panel understood the parameters of parole; that it was possible that a juror would believe that mercy equated to petitioner's serving only fifteen years then being released; and that it was possible that a juror would refuse to recommend mercy based on the belief that fifteen years is not a long enough sentence.

This Court has held that "[i]n a criminal case, the inquiry made of a jury on its voir dire is within the sound discretion of the trial court and not subject to review, except when the discretion is clearly abused." Syl. Pt. 2, *State v. Beacraft*, 126 W. Va. 895, 30 S.E.2d 541(1944), *overruled on other grounds by State v. Dolin*, 176 W. Va. 688, 347 S.E.2d 208 (1986). Additionally,

> [t]he purpose of such questioning should be to discover whether any of the prospective jurors hold any personal, moral, religious or philosophical beliefs, convictions, scruples or opinions which would preclude them from considering the imposition of a particular penalty in the event of conviction regardless of the circumstances of the case. The inquiry must go to the willingness of the prospective jurors to exercise their discretion to determine the penalty. Counsel may not use the *voir dire* to suggest a verdict to the jury or to elicit a commitment from the jury to return a particular penalty in the event of conviction.

*State v. Williams*, 172 W. Va. 295, 307, 305 S.E.2d 251, 264 (1983).

In the present case, in rejecting petitioner's line of questioning, the circuit court properly explained the purpose of the inquiry during voir dire is to discover if anyone on the panel had a conscientious objection to returning a first degree murder conviction when it could result in incarceration for life. As the circuit court rightly stated, the purpose of voir dire is not to explain the requirements for parole eligibility. That is not to say that the circuit court never addressed the matter, however. Indeed, at the conclusion of the evidence, the circuit court informed the jury as follows:

> If you find the defendant guilty of murder in the first degree, the court must sentence the defendant to confinement in the penitentiary for life. The defendant will not be eligible for parole unless you add to your verdict a recommendation of mercy. A recommendation of mercy would mean the defendant could be eligible for parole consideration only after having served a minimum of 15 years. Otherwise the defendant would be confined in the penitentiary for life without the possibility of parole.

4

Mere eligibility for parole in no way guarantees immediate parole after 15 years, Parole is given to inmates only after a thorough consideration of their record by the parole board.

Accordingly, we find no abuse of discretion by the circuit court in its handling of voir dire in this case.

In his second assignment of error, petitioner argues that the State produced insufficient evidence of premeditation and deliberation to sustain a first degree murder conviction. This Court has held that

[a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

Syl. Pt. 5, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). We elaborated, "there must be some evidence that the defendant considered and weighed his decision to kill in order for the State to establish premeditation and deliberation under our first degree murder statute." *Id.* at 675, 461 S.E.2d at 181.

Petitioner contends that he presented an unrebutted diminished capacity defense through the testimony of Dr. Saar and relies upon our holding in syllabus point three of *State v. Joseph,* 214 W. Va. 525, 590 S.E.2d 718 (2003), in which we held as follows:

The diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. This defense is asserted ordinarily when the offense charged is a crime for which there is a lesser included offense. This is so because the successful use of this defense renders the defendant not guilty of the particular crime charged, but does not preclude a conviction for a lesser included offense.

Upon our review, and in light of the standard under which we examine insufficiency-of-the-evidence claims, we find that the State presented sufficient evidence to sustain a first degree murder conviction in this case. Our review is guided by syllabus point three of *Guthrie,* in which we held that

[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find

5

guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

194 W. Va. at 662, 461 S.E.2d at 169. In this case, Dr. Saar's testimony was not unrebutted; the State presented Dr. Clayman, who opined that petitioner was capable of forming the intent to kill the victim. Second, this Court has outlined several factors that should be considered in determining the existence of premeditation and deliberation, several of which are present in this case:

> In the absence of statements by the accused which indicate the killing was by prior calculation and design, a jury must consider the circumstances in which the killing occurred to determine whether it fits into the first degree category. Relevant factors include the relationship of the accused and the victim and its condition at the time of the homicide; whether plan or preparation existed either in terms of the type of weapon utilized or the place where the killing occurred; and the presence of a reason or motive to deliberately take life. No one factor is controlling. Any one or all taken together may indicate actual reflection on the decision to kill. This is what our statute means by "willful, deliberate and premeditated killing."

*Id.* at 675 n.23, 461 S.E.2d at 182 n.23. Here, the evidence showed that petitioner had recently purchased a pistol; that he used that pistol to shoot the victim in the head at close range; that he wore a bullet-proof vest on the night of the killing; and that he had a motive to kill based on his belief, albeit mistaken, that the victim killed his daughter. Thus, we find there was sufficient evidence to sustain the verdict in this case.

Petitioner's third assignment of error is that the circuit court subjected him to multiple punishments in violation of double jeopardy and due process principles by allowing the State to pursue both grand larceny and possession of a stolen vehicle charges. Both charges related to the theft of the Ford Five Hundred. Petitioner moved the circuit court to compel the State to elect one of the charges to pursue, and the circuit court denied his motion.

This Court has held as follows:

> 7. A claim that double jeopardy has been violated based on multiple punishments imposed after a single trial is resolved by determining the legislative intent as to punishment.

> 8. In ascertaining legislative intent, a court should look initially at the language of the involved statutes and, if necessary, the legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentences for related crimes. If no such clear legislative intent can be discerned, then the court should analyze the statutes under the test set forth in

6

*Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses.

Syl. Pts. 7 and 8, *State v. Gill*, 187 W. Va. 136, 416 S.E.2d 253 (1992). "To support a conviction for larceny at common law, it must be shown that the defendant took and carried away the personal property of another against his will and with the intent to permanently deprive him of the ownership thereof." Syl. Pt. 3, *State v. Louk,* 169 W. Va. 24, 285 S.E.2d 432 (1981), *overruled on other grounds by State v. Jenkins*, 191 W. Va. 87, 443 S.E.2d 244 (1994). A grand larceny requires that the stolen goods be valued at $1,000 or more. *See* W.Va. Code § 61-3-13. Conversely, to be convicted of possession of a stolen vehicle, the State must prove that the defendant (1) possessed; (2) a vehicle; (3) knowing or having reason to believe the vehicle was unlawfully taken. *See* W.Va. Code § 17A-8-5. Clearly, the charge of grand larceny requires elements of proof not required for possession of a stolen vehicle. Thus, we find no error in the circuit court's denial of petitioner's motion to compel the State to pursue only one of the charges.

Fourth, petitioner argues that the admission of his statement to law enforcement violated the prompt presentment rule, which is codified in West Virginia Code § 62-1-5(a)(1):

An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence or as otherwise authorized by law, shall take the arrested person without unnecessary delay before a magistrate of the county where the arrest is made.

Additionally, "[t]he delay in taking a defendant to a magistrate may be a critical factor [in the totality of circumstances making a confession involuntary and hence inadmissible] where it appears that the primary purpose of the delay was to obtain a confession from the defendant. Syllabus Point 6, *State v. Persinger,* W. Va., 286 S.E.2d 261 (1982), as amended." Syl. Pt. 1, *State v. Guthrie*, 173 W. Va. 290, 315 S.E.2d 397 (1984).

Petitioner contends that the police had probable cause to arrest him for grand larceny at 1:30 a.m. on April 21, when they identified him on the GoMart surveillance, or when they issued the be-on-the-lookout for him at 4:00 a.m. that morning. Petitioner argues that, at the very latest, probable cause existed when the State Police trooper stopped him while driving in Webster County at 11:30 a.m. Petitioner concludes that the trooper should have taken him to the magistrate immediately, but instead, began eight minutes of questioning petitioner at 11:54 a.m., causing petitioner not to arrive at the magistrate until the afternoon.

Petitioner's argument demonstrates a misunderstanding of the prompt presentment rule. "Our prompt presentment rule . . . is triggered when an accused is placed under arrest. Furthermore, once a defendant is in police custody with sufficient probable cause to warrant an arrest, the prompt presentment rule is also triggered." Syl. Pt. 2, *State v. Humphrey*, 177 W. Va. 264, 351 S.E.2d 613 (1986). Also, "[o]rdinarily the delay in taking an accused who is under arrest to a magistrate after a confession has been obtained from him does not vitiate the confession under our prompt presentment rule." *Id.* at syl. pt. 4. In the present case, the petitioner

was arrested for grand larceny at approximately 11:40 a.m.; the trooper waited for backup, which arrived at 11:45 a.m.; petitioner then gave a statement at 11:54 a.m., which ended at 12:02 p.m.; they left for the magistrate's office at 12:38 p.m.; and arrived at 12:55 p.m. There is no evidence that the short delay between petitioner's arrest and his presentment to the magistrate was for the purpose of obtaining petitioner's confession. In fact, the larger delay occurred *after* petitioner gave his statement, which in no way persuades us that the statement should have been excluded. Under these facts, the circuit court properly allowed petitioner's statement to be admitted.

In his fifth assignment of error, petitioner argues the circuit court should have granted a mistrial based on prosecutor's description of the killing as an "execution." During opening statements, the prosecutor referred to the killing as "an execution" three times, to which petitioner ultimately objected. The prosecutor used the term because the shooting was at close-range to the victim's head. After opening statements, petitioner states that both counsel convened at the bench, where petitioner moved for a mistrial or for the circuit court to direct the jury to disregard the term "execution." The circuit court refused petitioner's request. Petitioner argues on appeal that the term was inflammatory, designed to incite emotion in the jury, and was misleading because not all close-range shootings are murders. In other words, petitioner argues that the term predisposed the jury to find premeditation.

Upon our review, we do not find that a mistrial was warranted. First, as part of the circuit court's charge to the jury, it explained that anything said by counsel in opening statements or closing arguments is not to be considered as evidence. Second, this Court has held as follows:

> 5. A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice.

> 6. Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Syl. Pt. 5 and 6, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995). Application of these factors to the prosecutor's comment in the present case supports the State's argument that petitioner's convictions should stand. The prosecutor's comments were isolated; petitioner conceded that he shot the victim in the head, so absent the remark, there was still competent proof of guilt; and there is no reason to conclude that the use of the term was to divert the jury's attention to extraneous matters. Accordingly, we find no error.

Petitioner's final assignment of error is that the admission of the incident between Mr. Summerfield and petitioner violated Rule 404(b) of the West Virginia Rules of Evidence. On petitioner's motion, the circuit court severed the attempted murder and wanton endangerment charges stemming from the incident with Mr. Summerfield at the Mountaineer Mart. The State

sought to introduce this evidence through Rule 404(b) as showing intent, plan, knowledge, or absence of mistake or accident with respect to the murder charge. Following an in camera hearing, the circuit court permitted the State to use the evidence to show plan or intent. Petitioner complains that the circuit court failed to make sufficient findings and conclusions to support its ruling.

With respect to the proposed use of Rule 404(b) evidence, this Court has held as follows:

When offering evidence under Rule 404(b) of the West Virginia Rules of Evidence, the prosecution is required to identify the specific purpose for which the evidence is being offered and the jury must be instructed to limit its consideration of the evidence to only that purpose. It is not sufficient for the prosecution or the trial court merely to cite or mention the litany of possible uses listed in Rule 404(b). The specific and precise purpose for which the evidence is offered must clearly be shown from the record and that purpose alone must be told to the jury in the trial court's instruction.

Syl. Pt. 1, *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994). Further, the circuit court should conduct an in camera hearing and instruct the jury on the limited purpose for which the evidence is offered. *See Id.* at syl. pt. 2, in part. In the present case, the circuit court conducted an in camera hearing, identified the specific bases under which the evidence could be offered, and instructed the jury accordingly. Thus, we find no error.

### Conclusion

For the foregoing reasons, we affirm the "Sentencing Order" entered by the Circuit Court of Randolph County on January 5, 2017.

Affirmed.

**ISSUED:** March 9, 2018

**CONCURRED IN BY:**

Justice Menis E. Ketchum
Justice Allen H. Loughry II
Justice Elizabeth D. Walker

**DISSENTING:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis

9