**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

State of West Virginia, Plaintiff Below,
Respondent

**FILED**
**November 5, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)** **No. 17-0099** (Randolph County 15-F-94)

**Derrick William Adamson, Defendant Below,**
**Petitioner**

**MEMORANDUM DECISION**

Petitioner Derrick William Adamson, by counsel J. Brent Easton, appealed his jury convictions for first degree murder, grand larceny, and possession of a stolen vehicle, which resulted in the circuit court sentencing him to life in prison without the possibility of parole for first degree murder, one to ten years for grand larceny and one to five years for possession of a stolen vehicle, with the latter two sentences to run concurrently to one another, but consecutively to the life sentence. Petitioner argued that the circuit court erred by: 1) refusing to question, or permit counsel to question, the prospective jurors as to whether they could give a recommendation of mercy if a guilty verdict were returned on first degree murder; 2) upholding the jury conviction for first degree murder as the State presented insufficient evidence of premeditation and deliberation; 3) denying petitioner's motion to compel the State to elect between the charges of grand larceny and possession of a stolen vehicle, subjecting him to multiple punishments in violation of double jeopardy[1] and due process principles;[2] 4) denying petitioner's pretrial motion to suppress statements taken by law enforcement well after the attachment of probable cause to arrest in violation of the prompt presentment rule; 5) failing to grant a mistrial or give an instruction after the prosecutor made the inflammatory remark during his opening statement that petitioner "executed" the victim; and 6) failing to make required findings of fact and conclusions of law prior to admitting "proposed" evidence under Rule 404(b) of the West Virginia Rules of Evidence. Respondent State of West Virginia, by counsel Shannon Kiser, filed a response.

Upon petitioner's appeal, this Court affirmed his conviction and sentence in *State v. Adamson*, No. 17-0099, 2018 WL 1225534 (W. Va. March 9, 2018) (memorandum decision),

---

[1]Article III, section 5 of the West Virginia Constitution provides, in relevant part: "No person shall . . . be twice put in jeopardy of life or liberty for the same offense."

[2]Petitioner provides no authority or argument concerning what due process principles were violated and, therefore, we do not address this portion of his argument.

determining that no error was committed by the circuit court. Following review of petitioner's petition for rehearing,[3] the Court, by order entered May 9, 2018, granted petitioner's request for a rehearing and scheduled the case for oral argument.

Having considered the petition for rehearing, the parties' briefs and oral arguments, the appendix record and the applicable legal authority, the Court finds no substantial question of law and no prejudicial error and, therefore, we again affirm petitioner's convictions and sentences. The Court also disposes of the case through a memorandum decision as contemplated under Rule 21 of the West Virginia Rules of Appellate Procedure.

## I. Factual and Procedural History

Donovan Nicholson was shot in the head at close range on April 20, 2015, in Elkins, West Virginia. On that day, around 11:00 p.m., Richard Foresi, a college student at Davis & Elkins, testified that he had an encounter with petitioner. Mr. Foresi was walking through Elkins when petitioner, whom he did not know, began asking him strange questions, including where he was going and how far his home was. Mr. Foresi found petitioner to be "definitely on edge[,] [n]ervous[,] [s]trange, for sure." Mr Foresi told petitioner that he was asking "some pretty strange questions[,]" and asked him if he was okay. Petitioner told him that "if he hadn't believed my story about, like where I was coming from, like I was coming from Davis & Elkins College, that he would have shot me already."

About 11:30 p.m., Cpl. G. L. Brown and Cpl. M. J. Sigley, both with the Elkins Police Department, responded to a call from the Mountaineer Mart of possible shots being fired. The officers spoke with the manager, who stated that she thought she had heard a gunshot outside of the Mountaineer Mart and that two males appeared to her to be talking prior to her hearing the shot. The manager provided the officers with a detailed description of one of the men she had observed. The officers left and proceeded to search for someone matching the description given.

Shortly thereafter, Cpl. Sigley located an individual matching the description given on the front side of the railroad depot. The individual was identified as petitioner, who was described as being responsive to the officer's commands. In searching petitioner, the officer found a box of PMC Bronze .25-caliber ammunition in petitioner's pocket, but no gun was found. The officers received another call about an active burglary, unrelated to their stop of

---

[3]Petitioner only reargued three of the original six assigned errors in his petition for rehearing; however, as the grant of rehearing was not limited to the errors raised in the rehearing petition, the Court will again address all the assigned errors originally argued by petitioner.

petitioner. They left petitioner as there was not enough probable cause at that time to arrest him.

Approximately twenty minutes later, after the officers cleared the burglary call, they received another call from the manager of the Mountaineer Mart. The manager told the officers that the other male individual she had observed prior to hearing the gunshot was back. That individual was identified as Timothy Summerfield, whom the manager had observed with petitioner prior to hearing the gunshot. Mr. Summerfield told the officers that he had engaged in a casual conversation with petitioner for about five to eight minutes, when petitioner pulled a small pistol, pointed it at him and squeezed the trigger. The gun failed to fire and petitioner "walked up to me and shook my hand. Said, 'It wasn't your day,' and walked off."[4] The officers found no spent .25-caliber casing, no spent bullet and no bullet hole at the scene.

While still at the Mountaineer Mart, around 1:30 a.m., on April 21, 2015, the officers received a call about a vehicle, described as a 2006 Ford 500 gold car, which was stolen from the parking lot of a GoMart convenience store that was located about four to five blocks away from the Mountaineer Mart, and responded to that call. The officers viewed surveillance video from the store and were able to identify petitioner as the person driving away in the stolen vehicle. The officers put out a "be on the lookout" for the stolen car and petitioner. Cpl. Brown, thinking that petitioner may have disposed of the gun related to the earlier incident somewhere between the GoMart and the Mountaineer Mart, began a foot patrol of the area looking for the gun. Cpl. Brown ended up back where he had previously made contact with petitioner. It was at this time, he discovered the victim's body. The officer also found a PNC Bronze .25-caliber cartridge lying beside the victim's body, which was consistent with the ammunition earlier seized from petitioner.

Later that day, around 11:36 a.m., Trooper Eric E. Bostic, with the West Virginia State Police, located the stolen vehicle and petitioner in Webster County. The trooper was aware that a grand larceny warrant had been issued for petitioner and that there had been a shooting. The trooper patted petitioner down, placed petitioner in handcuffs, and put him in the back of his car until additional help arrived. The trooper found petitioner wearing a bulletproof vest.

---

[4]Petitioner brought out in cross-examination of Mr. Summerfield that during the preliminary hearing and in a statement to police on the night of the incident that Mr. Summerfield did not mention seeing a gun. Mr. Summerfield clarified that he never saw a gun "prior to while we were talking, but he did pull a gun and shoot at me. I mean he fired a round."

Backup arrived for Trooper Bostic around 11:45 a.m. and, at that time, the trooper searched petitioner, read him his *Miranda*[5] rights and again placed him in the back of his cruiser. Around 11:54 a.m., petitioner proceeded to make a voluntary statement to the trooper, which was audio-recorded and lasted approximately eight minutes. Petitioner began talking about his twelve-year-old daughter, who petitioner thought had been killed.[6] The trooper asked petitioner for his daughter's age, name and description. The trooper also asked petitioner about where his daughter was staying and how he came to know that she was missing. It was during this exchange about petitioner's missing daughter that petitioner disclosed that he was walking around the train tracks in Elkins, when a man petitioner stated he did not know told him, "We killed her." The trooper asked petitioner what happened then and petitioner stated, "I shot him." Petitioner went on to tell the trooper that he shot the man in Elkins at the train station with a .25 caliber pistol. He also admitted to stealing the car he had been driving. Petitioner indicated that he was searching for his daughter.[7] Petitioner was transported to a magistrate, arriving at 12:55 p.m. He was indicted on counts of first degree murder, attempted first degree murder, wanton endangerment involving a firearm, grand larceny of a vehicle, possession of a stolen vehicle and receiving or transferring stolen goods.[8]

Petitioner's defense was one of conceding that he was responsible for shooting the victim. But petitioner maintained that he could only be convicted of second degree murder, because he had diminished capacity and could not have formed the requisite premeditation and deliberation necessary for first degree murder. Petitioner did not testify. In support of his defense, petitioner called Dr. Timothy Saar, a licensed psychologist, who testified that he had evaluated and interviewed petitioner. He stated that he had reviewed petitioner's medical records, which indicated that petitioner had a history of substance-induced psychosis for which he had been hospitalized at William Sharpe Hospital in 2007. Records the doctor reviewed also indicated that petitioner had been treated at Ohio State University Medical Center in 2011 for a mood disorder associated with substance abuse. Petitioner was seen again at the same facility in 2014 in which the treating physician "talked about [the] previous

_____

[5]*See Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (defining custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").

[6]The trooper found petitioner's alleged missing daughter in school.

[7]Gunshot residue was found on petitioner's hands.

[8]The circuit court granted petitioner's motion to sever the attempted first degree murder count and the wanton endangerment count as they related to a different victim, Mr. Summerfield.

4

diagnosis of substance-induced psychosis[,]" but also had "some concerns of maybe some malingering going on[.]" Dr. Saar, based upon the records reviewed, found that "there [was] reason to believe that he was suffering a psychosis" on or about the day of the crimes alleged. Specifically, Dr. Saar opined that petitioner "was so grossly intoxicated, based on his self-reports, that his executive functioning was impaired to the point that he was incapable of deliberating and premeditating the shooting on the day in question[.]" During cross-examination by the State, Dr. Saar testified that he had to throw out the entire assessment related to his administration of the Minnesota Multiphasic Personality Inventory given to petitioner because petitioner was not being truthful. Dr. Saar also testified that he had no toxicology report or any other scientific evidence that showed petitioner was abusing drugs or intoxicated on the day of the events giving rise to the criminal charges. The doctor relied entirely upon petitioner's self-reporting and admitted that petitioner had a significant history of malingering–"intentionally lying to present a certain diagnosis[,]" or "overexaggeration of his symptons."

Petitioner also called Dr. David A. Clayman, a licensed psychologist, who examined petitioner for the State. He acknowledged that petitioner had a history of substance abuse. Dr. Clayman also noted the history of malingering found by Dr. Saar's report. But, contrary to petitioner's assertion in his petition for rehearing that Dr. Clayman failed to address petitioner's ability to premeditate or deliberate the shooting, Dr. Clayman testified that

> there is nothing to suggest that he was under the influence of
> any type of substance or suffering from a mental condition that
> would have prevented him from forming intent or to form . . .
> malice. He demonstrated a consistent ability to form intent
> whether it be to cause harm or to restrict his own behaviors up
> to and including the shooting death of Donovan Nicholson.

Dr. Clayman further stated that petitioner "did not suffer from diminished capacity." Dr. Clayman admitted that he did not address premeditation or deliberation; but, he also testified that petitioner "was behaving in a purposeful, goal-directed, and sequential manner" on the day of the shooting.

Following a three-day trial, a jury convicted petitioner of first degree murder, grand larceny of a vehicle and possession of a stolen vehicle. The jury did not recommend mercy. Petitioner was acquitted of receiving or transferring stolen property relating to the bullet-proof vest. The circuit court denied petitioner's post-trial motions for judgment of acquittal and for a new trial. This appeal followed.

## II. Standard of Review

Our review of the various assigned errors necessitates application of different standards of review and each will be set forth within the discussion of the error raised by petitioner.

## III. Discussion

Petitioner first argues that during voir dire the circuit court denied him "a meaningful opportunity to question the jurors regarding the issue of mercy." Petitioner sought to inquire of the prospective jurors regarding whether they "would be predisposed with respect to a recommendation either for or against mercy," and "whether the panel fully understood that the possibility of parole after fifteen years was not absolute."

As to whether the potential jurors were predisposed to recommend either for or against mercy, the circuit court inquired of prospective jurors as follows:

> Ladies and gentlemen, are any of you aware of any conscientious objection you may have to returning a verdict of first degree murder if, that is, that the evidence that you believe – the verdict that you believe is appropriate based upon the evidence, if you realize that in doing so there may be – you also have the opportunity to determine whether or not mercy is recommended or whether no mercy is recommended. With the idea that no mercy means that the defendant could be incarcerated for life. Mercy would indicate that he would have the opportunity [to] be paroled. Do you understand that? Do you think that there's – does anyone here believe that they would have any conscientious objection to rendering a verdict given those circumstances?

The circuit court further had informed defense counsel that prior to asking this question of the prospective jurors that "[i]f there's anyone who indicates that they have any kind [of] objection or conscientious awareness of it, we'll pull them up[,] talk to them, and we'll resolve it." Not one of the prospective jurors voiced any conscientious objection and, therefore, no follow-up questions were asked by the circuit court or the attorneys on this issue. Concerning petitioner's request to fully inform the prospective jurors that if they granted mercy that did not mean that he would automatically get paroled after serving fifteen years, the circuit court determined that consequences of granting or not granting mercy was better left for the instructions given prior to the jury's deliberation. And the circuit court did instruct the jury, after hearing all the evidence, about what a recommendation of mercy meant.

6

We have previously held that "[i]n a criminal case, the inquiry made of a jury on its voir dire is within the sound discretion of the trial court and not subject to review, except when the discretion is clearly abused." Syl. Pt. 2, *State v. Beacraft*, 126 W. Va. 895, 30 S.E.2d 541 (1944), *overruled on other grounds by State v. Dolin*, 176 W. Va. 688, 347 S.E.2d 208 (1986), *overruled on other grounds by State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Under this standard of review, we examine petitioner's claim.

Generally, "[a]defendant charged with murder of the first degree is entitled to question potential jurors on *voir dire* to determine whether any of them are unalterably opposed to making a recommendation of mercy in any circumstances in which a verdict of guilt is returned." Syl. Pt 7, *State v. Williams*, 172 W. Va. 295, 305 S.E.2d 251 (1983). But we further explained, in *Williams*, that in the context of a first degree murder case

> [t]his is not to say, however, that counsel for the accused is allowed unlimited latitude in the *voir dire* examination of the potential jurors on this issue. The purpose of such questioning should be to discover whether any of the prospective jurors hold any personal, moral, religious or philosophical beliefs, convictions, scruples or opinions which would preclude them from considering the imposition of a particular penalty in the event of conviction regardless of the circumstances of the case. The inquiry must go to the willingness of the prospective jurors to exercise their discretion to determine the penalty. Counsel may not use the *voir dire* to suggest a verdict to the jury or to elicit a commitment from the jury to return a particular penalty in the event of conviction. *State v. Ward*, 569 S.W.2d 341 (Mo. App.1978); *State v. McCaine*, 460 S.W.2d 618 (Mo.1970).

*Williams*, 172 W. Va. at 307, 305 S.E.2d at 264. We subsequently noted this limitation of our holding in *Williams* in syllabus point six of *State v. McFarland*, 175 W. Va. 205, 332 S.E.2d 217 (1985), *superceded by rule as stated in State v. Joseph*, 214 W. Va. 525, 590 S.E.2d 718 (2003):

> A criminal defendant is not entitled as a matter of right, under syl. pt. 7, *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983), to question potential jurors on *voir dire* to determine their views on the various theories underlying incarceration, namely, rehabilitation, punishment and deterrence. It is within the discretion of the trial court whether such a question may be asked on *voir dire* to enable the defendant to exercise more informed judgment in utilizing his peremptory challenges.

7

In this case, the circuit court inquired of potential jurors whether they had any objection to rendering a verdict that would require them either to give or refuse to give mercy, meaning that petitioner would be incarcerated for life. But the circuit court refused petitioner's request that it inform potential jurors about the meaning of giving mercy, including that being eligible for parole in fifteen years does not automatically allow a person to get out of incarceration because other criteria must be weighed. The circuit court explained that the purpose of voir dire was not to give the criteria for parole, but to explore whether any of the prospective jurors had beliefs, opinions or views that would impact their ability to determine a verdict, which could require the imposition of a sentence of life without mercy. The circuit court did not abuse its discretion in its handling of the voir dire in this case.

In his second assigned error, petitioner contends that the evidence presented at trial was insufficient to support a first degree murder conviction as the State failed to prove premeditation and deliberation. In his rehearing petition, petitioner maintains that he presented "unrebutted evidence of Mr. Adamson's diminished capacity[,]" which showed that at the time of the shooting he suffered from diminished capacity caused by substance-induced psychosis and was incapable of premeditation and deliberation. *See Joseph*, 214 W. Va. at 526-27, 590 S.E.2d 719-20, Syl. Pt. 3 (holding that "[t]he diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. . . ."). Thus, petitioner argues he could not be convicted of anything greater than second degree murder.

This Court has previously held:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

8

Regarding, the elements of premeditation and deliberation, we have held that

> [a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

*Id.* at 664, 461 S.E.2d at 170, Syl Pt. 5. Further,

> [i]n criminal cases where the State seeks a conviction of first degree murder based on premeditation and deliberation, a trial court should instruct the jury that murder in the first degree consists of an intentional, deliberate, and premeditated killing which means that the killing is done after a period of time for prior consideration. The duration of that period cannot be arbitrarily fixed. The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ and according to the circumstances in which they may be placed. Any interval of time between the forming of the intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious of what he intended, is sufficient to support a conviction for first degree murder.

*Id.*, Syl. Pt. 6. Hence, "[t]here must be some evidence that the defendant considered and weighed his decision to kill in order for the State to establish premeditation and deliberation under our first degree murder statute." *Id.* at 675, 461 S.E.2d at 181. As the Court indicated in *Guthrie*,

> [i]n the absence of statements by the accused which indicate the killing was by prior calculation and design, a jury must consider the circumstances in which the killing occurred to determine whether it fits into the first degree category. Relevant factors include the relationship of the accused and the victim and its condition at the time of the homicide; whether plan or preparation existed either in terms of the type of weapon utilized or the place where the killing occurred; and the presence of a reason or motive to deliberately take life. No one factor is controlling. Any one or all taken together may indicate actual

9

> reflection on the decision to kill. This is what our statute means by "willful, deliberate and premeditated killing."

*Id.* at 675 n.23, 461 S.E.2d at 181 n.23.

Despite petitioner's argument, he ignores the fact that his own expert's opinion was based on petitioner's self-reports that he was so grossly intoxicated on the day of the shooting that he was incapable of deliberation and premeditation. But Dr. Saar admitted that petitioner had a significant history of malingering or "intentionally lying to present a certain diagnosis[,]" or "overexaggeration of his symptons." Further, Dr. Saar testified that he had to throw out the entire assessment related to his administration of the Minnesota Multiphasic Personality Inventory to petitioner because petitioner was not being truthful. Dr. Saar also testified that he had no toxicology report or any other scientific evidence that showed petitioner was abusing drugs or intoxicated on the day of the events giving rise to the criminal charges. Additionally, Dr. Clayman's testimony was that petitioner was not under the influence of any substance or suffering from any mental condition that would have prevented him from forming intent or malice. Dr. Clayman affirmatively concluded that petitioner "did not suffer from diminished capacity." Dr. Clayman admitted that he did not address premeditation or deliberation; but, he also testified that petitioner "was behaving in a purposeful, goal-directed, and sequential manner" on the day of the shooting.

Finally, the State also offered evidence that petitioner had recently purchased a pistol, that the same pistol was used to shoot the victim in the head at close range, that petitioner was wearing a bullet-proof vest on the night of the killing, and that petitioner stated that his motive to kill the victim was his belief that the victim had killed his daughter, even though that turned out to be not true. *See id.* Based upon our review of the record, there was sufficient evidence to sustain the first degree murder conviction.

Petitioner's third assigned error concerns the circuit court's denial of petitioner's motion to compel the State to elect between the charges of grand larceny and possession of a stolen vehicle. Petitioner contends that the circuit court subjected him to multiple punishments in violation of double jeopardy principles by allowing the State to pursue both grand larceny and possession of a stolen vehicle charges. We disagree. The State charged petitioner in Count 4 of the indictment with grand larceny,[9] arising out of the theft of the 2006 Ford 500 vehicle from the convenience store in Elkins. Petitioner was also charged in Count 5 with possession of the same vehicle described in Count 4.[10]

---

[9]*See* W. Va. Code § 61-3-13 (distinguishing grand and petit larceny).

[10]*See id.* § 17A-8-5.

The standard of review applicable to this constitutional issue is as follows: "'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995)." *State v. Smith*, 225 W. Va. 706, 709, 696 S.E.2d 8, 11 (2010).

When examining claimed double jeopardy violations, we follow the law enunciated in syllabus points seven and eight of *State v. Gill*, 187 W. Va. 136, 416 S.E.2d 253 (1992):

> A claim that double jeopardy has been violated based on multiple punishments imposed after a single trial is resolved by determining the legislative intent as to punishment.

> In ascertaining legislative intent, a court should look initially at the language of the involved statutes and, if necessary, the legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentences for related crimes. If no such clear legislative intent can be discerned, then the court should analyze the statutes under the test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses.

Under the applicable statutes, "'[t]o support a conviction for larceny[11] at common law, it must be shown that the defendant took and carried away the personal property of another against his will and with the intent to permanently deprive him of the ownership thereof.' Syllabus Point 3, *State v. Louk*, [169] W. Va. [24], 285 S.E.2d 432 (1981)." Syl. Pt 1, *State v. Houdeyshell*, 174 W. Va. 688, 329 S.E.2d 53 (1985) (footnote added). Conversely, West Virginia Code § 17A-8-5 provides:

> Any person who, with intent to procure or pass title to a vehicle which he knows or has reason to believe has been stolen or unlawfully taken, receives, or transfers possession of the same from or to another, *or who has in his possession any vehicle which he knows or has reason to believe has been stolen or unlawfully taken*, and who is not an officer of the law

---

[11]*See id.* § 61-3-13 (requiring value of stolen goods to be $1,000 or more for grand larceny).

engaged at the time in the performance of his duty as such officer, is guilty of a felony.

(Emphasis added). Thus, this statute requires the State prove that a person 1) possess; 2) a vehicle; 3) that the person knew or had reason to believe it to be unlawfully taken in order to be convicted of possession of a stolen vehicle. *Id.*

It is readily discerned from our review of both grand larceny and possession of a stolen vehicle, West Virginia Code § 17A-8-5, that each requires the State to prove elements that are different. We, therefore, reject petitioner's argument that double jeopardy principles were violated and find the circuit court did not err in denying petitioner's motion to compel the State to pursue only one of the aforementioned charges.

Petitioner's fourth assignment of error is that the circuit court erred in admitting his confession as it was given in violation of the prompt presentment rule. According to petitioner in his petition for rehearing, the Court "misunderstands the prompt presentment rule." Petitioner contends that probable cause to arrest him attached, "at the very latest" when he was discovered inside the stolen vehicle on the roadside in Webster County as Trooper Bostic testified that he was aware of an arrest warrant for petitioner at the time he stopped petitioner. Petitioner argues that he should have been taken directly to a magistrate and that the reason he was not was for the purpose of obtaining a confession.

Our review of this issue is governed by the following standard of review: "On appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference." Syl. Pt. 3, *State v. Stuart*, 192 W. Va. 428, 452 S.E.2d 886 (1994); *accord* Syl. Pt. 1, *State v. Rogers*, 231 W. Va. 205, 744 S.E.2d 315 (2013).

Our prompt presentment rule is set forth in West Virginia Code 62-1-5(a)(1), which provides:

> An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence or as otherwise authorized by law, shall take the arrested person without unnecessary delay before a magistrate of the county where the arrest is made.

12

*See* W. Va. R. Crim. P. 5(a). The prompt presentment rule "'is triggered when an accused is placed under arrest. Furthermore, once a defendant is in police custody with sufficient probable cause to warrant an arrest, the prompt presentment rule is also triggered.' Syl. Pt. 2, *State v. Humphrey*, 177 W. Va. 264, 351 S.E.2d 613 (1986)." *Rogers*, 231 W. Va. at 207, 744 S.E.2d at 317, Syl. Pt. 4, in part. Any delay in taking a defendant to a magistrate that is due to "'the primary purpose'" of obtaining a confession "'may be a critical factor [in the totality of circumstances making a confession involuntary and hence inadmissable][.]'" Syl. Pt. 1, *State v. Guthrie*, 173 W. Va. 290, 315 S.E.2d 397 (1984)(quoting, in part, Syl. Pt. 6, *State v. Persinger*, 169 W. Va. 121, 286 S.E.2d 261 (1982)). But necessary delays do not render a confession involuntary. "Examples of necessary delay might include those required: 1) to carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; . . . [and] 4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value[.]" *Id.* at 135-36, 286 S.E.2d at 270 (quoting *Johnson v. State*, 384 A.2d 709, 717 (Md. 1978)).

In this case, Trooper Bostic testified that on the morning of April 21, around 11:36 a.m., he located the stolen vehicle and petitioner in Webster County. The trooper was aware that a grand larceny warrant had been issued for petitioner and that there had been a shooting. Petitioner was then placed in the back of the trooper's car until additional help arrived. Backup arrived for Trooper Bostic around 11:45 a.m. and, at that time, Trooper Bostic searched petitioner and read him his *Miranda* rights. Around 11:54 a.m., petitioner proceeded to make a voluntary statement to the trooper, which was recorded and lasted approximately eight minutes. Once petitioner completed his voluntary statement, he was transported to a magistrate at approximately 12:38 p.m., arriving at the magistrate's office around 12:55 p.m. There is no evidence that the short delay in taking petitioner to the magistrate had, as its primary purpose, the goal of obtaining a confession. There is no evidence that Trooper Bostic intimidated, threatened, or intentionally delayed taking petitioner to a magistrate. Audio evidence showed that petitioner voluntarily began talking to the trooper about his twelve-year-old daughter, who petitioner thought had been killed. During the trooper's attempt to gain more information about petitioner's daughter, petitioner confessed to the murder. According to the record, Trooper Bostic did not inquire about any crime until petitioner stated that he shot the victim because he believed the victim had killed his daughter. Accordingly, we find the circuit court did not err in allowing petitioner's statement to be admitted into evidence.

The fifth assigned error is whether the circuit court erred in failing to grant a mistrial or provide an instruction after the prosecutor used the words "execute" or "execution" on three occasions during his opening statement to describe the shooting that occurred in this case. As the prosecutor remarked on one occasion, "I say he executed Donovan because he shot him in the head at close range . . . ." Petitioner objected after the prosecutor used the word the third time in his closing. Following petitioner's opening statement, petitioner also

13

moved for a mistrial or, at a minimum, an instruction to the jury to disregard the remark. The circuit court denied petitioner's requests. But the circuit court did instruct the jury at the close of all the evidence that whatever is said in opening statements and closing arguments is not to be considered evidence.

Petitioner argues that a shooting in the head at close range could be evidence of anything ranging from premeditated murder to involuntary manslaughter "to nothing at all." So the prosecutor's description of the shooting in this case as an execution, because petitioner was shot in the head at close range, necessarily predisposed the jury to return a verdict of premeditated murder.

In syllabus points five and six of *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995), we held:

> A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice.

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

We also stated in *Sugg* that "[c]learly, a prosecuting attorney should refrain from referring to questionable evidence that may poison the jury's mind against the defendant. However, there is equally clear authority that a prosecuting attorney's suggestion of a plausible inference to be drawn from the evidence is proper." *Id.* at 405, 456 S.E.2d at 484.

In the instant case, petitioner admitted to shooting the victim in the head, so the degree to which the prosecutor's remarks tended to mislead the jury and to prejudice petitioner is limited. The prosecutor's remarks were also isolated and he explained that the term was used because the victim was shot in the head at close range. Also, without the prosecutor's remarks, there was other sufficient evidence of the crime and there was no indication that the use of the term execute was deliberately placed before the jury to divert its attention from other extraneous matters. *See id.* at 393, 456 S.E.2d at 474, Syl. Pt 6.

14

Finally, petitioner assigned as error that the circuit court erred by not making findings of fact and conclusions of law prior to admitting evidence of the incident between Mr. Summerfield and petitioner under West Virginia Rule of Evidence 404(b). Specifically, the evidence that was sought to be introduced by the State concerned the attempted first degree murder and wanton endangerment of Mr. Summerfield. The defense was successful in its motion to sever these charges in the indictment. But the State sought to introduce evidence regarding these charges during the trial that is the subject of this appeal to show petitioner's "intent, plan, knowledge, and/or absence of mistake or accident in committing the offense of Murder" for which he was being tried.[12] The circuit court conducted an in camera hearing pursuant to *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994), to determine the admissibility of the evidence. By order entered October 5, 2015, the circuit court determined that the State could admit the evidence pursuant to Rule 404(b) "to prove intent or plan as to Court 1 (first degree murder) of the Indictment at the trial herein." Petitioner now claims that the circuit court's order is insufficient.

As we held in *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996):

> The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose**.** Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

196 W. Va. at 310-11, 470 S.E.2d at 629-30. Further, in *McGinnis*, we explained that this Court will "review the trial court's decision to admit evidence pursuant to Rule 404(b) under an abuse of discretion standard." 193 W.Va. at 159, 455 S.E.2d at 528. We also stated that

> [o]ur function on . . . appeal is limited to the inquiry as to whether the trial court acted in a way that was so arbitrary and irrational that it can be said to have abused its discretion. In reviewing

---

[12]The State supplemented its notice of intention to use the evidence under West Virginia Rule of Evidence 404(b) by stating that the evidence also supported petitioner's identity as the perpetrator.

the admission of Rule 404(b) evidence, we review it in the light most favorable to the party offering the evidence, in this case the prosecution, maximizing its probative value and minimizing its prejudicial effect.

*Id*. at 159, 455 S.E.2d at 528.

A circuit court must follow the following requirements in order to admit evidence pursuant to Rule 404(b):

> Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

193 W. Va. at 151, 455 S.E.2d at 520, Syl. Pt. 2.

The circuit court could have issued a more detailed order. Despite that fact, the appendix record shows that the circuit court clearly complied with *McGinnis* by conducting an in camera hearing, identifying in its order the specific bases under which the State could offer the evidence pursuant to Rule 404(b), and instructing the jury regarding this limited

16

purpose. The circuit court, therefore, did not err in its determination that the subject evidence was admissible.

## IV. Conclusion

Based upon the foregoing reasons, we again affirm the January 5, 2017, sentencing order entered by the Circuit Court of Randolph County.

Affirmed.

**ISSUED**:  November 5, 2018

**CONCURRED IN BY**:

Chief Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Paul T. Farrell sitting by temporary assignment
Justice Tim Armstead
Justice Evan H. Jenkins

Justice Allen H. Loughry II suspended and therefore not participating.